# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLARK H. BROWN<br>9630 Milestone Way<br>Apt. 4103<br>College Park, MD  20740<br><br>       Plaintiff,<br><br>       v.<br><br>DR. CARLA HAYDEN,<br>in her official capacity as<br>Librarian of Congress<br>Library of Congress<br>101 Independence Ave SE<br>Washington, DC 20540<br><br>       Defendant. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Now comes Plaintiff Clark Henderson Brown ("Plaintiff" or "Mr. Brown"), through his attorneys at Clark Law Group, PLLC, and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action against Dr. Carla Hayden, alleging discrimination on the basis of his disability and age, failure to accommodate, unlawful medical inquiry, retaliation, hostile work environment, and constructive discharge, in violation of Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. § 1301, *et seq*.; Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq*.; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.* As an alternative to his statutory claims, Plaintiff alleges violations of his right to equal protection of the law, which is guaranteed by the Fifth Amendment

of the United States Constitution.  Finally, Defendant's actions violate Library of Congress ("LOC") regulations prohibiting discrimination and harassment.

## JURISDICTION AND VENUE

2.   The United States District Court for the District of Columbia (the "Court") may exercise original subject-matter jurisdiction over Mr. Brown's Rehabilitation Act, ADEA, and Fifth Amendment claims pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 1343(a)(4) (civil rights) because those claims arise under the laws of the United States and seek redress for violations of civil rights.

3.   The Court may exercise original subject-matter jurisdiction over Mr. Brown's claims arising under the CAA pursuant to 2 U.S.C. § 1408(a) because Mr. Brown:  (1) is a covered employee by virtue of his employment with the LOC; (2) completed counseling and mediation pursuant to 2 U.S.C. §§  1402-03; and (3) filed this action within the time period prescribed in 2 U.S.C. § 1404.

4.   Venue is properly laid in the District of Columbia pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

6.   Plaintiff has fulfilled all conditions precedent to bringing his claims under the Rehabilitation Act and ADEA and has otherwise exhausted his administrative remedies with respect to those claims as follows:

a.      On September 27, 2017, Plaintiff submitted an informal request for counseling with LOC's Office of Equal Employment Opportunity and Diversity Programs ("EEO Office"). The request described LOC's failure to accommodate Mr. Brown's disability and harassment.

b.      The EEO Office accepted Plaintiff's informal request for counseling and commenced Alternative Dispute Resolution with respect to Plaintiff's claims.

c.      On December 5, 2017, Plaintiff filed a formal EEO Complaint based on the allegations raised in his September 27, 2017 request for counseling.

d.      On January 3, 2018, Defendant's EEO Office informed Plaintiff that his Complaint was rejected as untimely because it listed the dates of the alleged discrimination and harassment as beginning on June 27, 2017 and continuing to the present, but did not list any specific dates within the 45-day limitations period.

e.      Mr. Brown was not required to identify a specific instance of harassment within the 45-day limitations period in order to show that his claims were timely because he stated that they continue to the present day.

f.      Mr. Brown's disability prevented him from appealing the EEO Office's decision within the five-day time period prescribed by LOC regulations.

g.      LOC waived any timeliness claim by accepting the informal complaint for processing.

h.      In February of 2018, Plaintiff initiated a second informal complaint with the EEO Office alleging failure to accommodate.

i.      On April 25, 2018, the EEO Office issued to Plaintiff Notice of Right to File a Formal Complaint based on his February 2018 request for counseling.

3

      j.      On or about April 26, 2018, Plaintiff submitted his Complaint to Defendant's EEO Office.

      k.      More than 180 days have passed since Plaintiff submitted his April 2018 Complaint.

      l.      Plaintiff did not withdraw his April 2018 Complaint.

7.      Plaintiff has fulfilled all conditions precedent to bringing his claims under the CAA as follows:

      a.      On June 1, 2018, Plaintiff submitted a request for counseling to LOC's Office of Compliance.  Mr. Brown listed age and disability discrimination and reprisal as bases for the request and described instances of LOC's harassment, retaliation, and discrimination against him.

      b.      On July 8, 2018, Mr. Brown submitted to the Office of Compliance a completed Request for Mediation form.

      c.      On August 10, 2018, the Office of Compliance issued to Mr. Brown an End of Mediation notice.

8.      Plaintiff has exhausted his administrative remedies as to the allegations of this Complaint.

## PARTIES

9.      All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

10.      Plaintiff Clark H. Brown is a natural person residing in College Park, Maryland.  He is 63 years old.

11.      Mr. Brown is a covered employee under the CAA, the Rehabilitation Act, and the ADEA.

12.     Defendant Carla Hayden is the Librarian of Congress and as such heads LOC, a department within the Legislative Branch of the Government of the United States. As the Librarian of Congress, Ms. Hayden is responsible for the personnel actions, omissions, and practices therein. She is sued in her official capacity.

13.     Defendant is a covered employer under the CAA, the Rehabilitation Act, and the ADEA.

## FACTS RELEVANT TO ALL CLAIMS

14.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

### Mr. Brown's Employment with the LOC

15.     Mr. Brown was hired by LOC in 2002 as a Library Technician.  He was promoted in 2005 to a position as Network Librarian and again in 2012 to a position as Network Program Specialist and Contracting Officer's Representative ("COR"), which position he held at all times relevant to this Complaint.

16.     Mr. Brown served within LOC's National and International Outreach (NIO) Branch, FEDLINK Division.

17.     Mr. Brown was a GS-13 level employee.

18.     In 2014, LOC rated Mr. Brown's performance as "Excellent."

19.     In 2015, LOC rated Mr. Brown's performance as "Excellent."

20.     In 2016, LOC rated Mr. Brown's performance as "Satisfactory."

### Mr. Brown Has a Disability

21.     On or about April 26, 2017, Mr. Brown suffered from a stroke.

22.    Mr. Brown's stroke is an impairment of his nervous system which substantially limits his ability to perform major life activities such as walking, concentrating, balancing, lifting, remembering, speaking, handwriting, and regulating his emotions.

23.    The effects of Mr. Brown's stroke are long term.

24.    Mr. Brown's stroke required an intense rehabilitation program consisting of biweekly physical and speech therapy sessions.

25.    Mr. Brown's stroke is a disability as that term is defined by the Rehabilitation Act.

**Mr. Brown Requested Accommodations for His Disability, Which Were Denied.**

26.    Mr. Brown returned to work on June 26, 2018 on a light duty basis.

27.    Upon Mr. Brown's return to work, he informed LOC of his stroke and requested other accommodations for his disability, including a list of specific job duties in writing, reassignment, a 6:30 a.m. start time, avoiding bending and lifting, teleworking, and advanced and donated sick leave.

28.    Mr. Brown's supervisors either ignored these requests or denied them without acknowledging Mr. Brown's disability.

29.    On June 28, 2017, Mr. Brown asked his supervisor, Isabella Marques de Castilla, for a list of his job duties in writing.

30.    Ms. Marques de Castilla responded that Mr. Brown would "receive a performance requirement document like everyone else" and stated that he was "required to perform other duties as assign[]."

31.    In July 2017, Mr. Brown reminded Ms. Marques de Castilla and Ms. Georgette Harris, acting FEDLINK Network Coordinator at the time, of his request for a list of job duties and expectations and writing, which he had not been provided.

32.     He stated that he needed the list of job duties to bring with him to a doctor's appointment the following Monday.

33.     Ms. Marques de Castilla never provided the requested list.

34.     Ms. Harris never provided the requested list.

35.     On July 11, 2017, Ms. Harris emailed Mr. Brown, denying his request for reassignment. She wrote: "If an opportunity avails itself or a job opportunity is offered it is up to you to determine whether or not to accept an offer."

36.      Ms. Harris did not ask Mr. Brown about his qualifications.

37.     Ms. Harris did not inform Mr. Brown of any vacancies within LOC.

38.     Ms. Harris did not attempt to help Mr. Brown locate a vacant position for which he was qualified.

39.     Mr. Brown applied for annual leave to care for a medical emergency using a form provided by LOC.

40.     Although the form did not call for her approval, Ms. Marques de Castilla wrote "*disapprove*" by her name on the form.

41.     Mr. Brown requested donated sick leave from the LOC's donated sick leave bank.

42.     Ms. Marques de Castilla denied that request, without engaging in the interactive process.

43.     Mr. Brown requested meetings with Ms. Marques de Castilla to discuss his need for an accommodation.

44.     Ms. Marques de Castilla denied those requests.

45.     When Ms. Marques de Castilla finally agreed to meet with Mr. Brown, she asked him repeatedly about his retirement plans.

46.     Mr. Brown never expressed any interest in retiring to Ms. Marques de Castilla.

## **Defendant Discriminated and Retaliated Against Mr. Brown**

47.     In addition to failing to accommodate Mr. Brown, Defendant altered the terms and

conditions of his employment after he returned to work from his stroke and requested

accommodations for his disability.

48.     Defendant knew or should have known that these changes were contrary to Mr. Brown's

doctor's instructions and would aggravate his disability.

49.     Before his stroke, Mr. Brown worked a daily schedule of 6:30 a.m. to 3 p.m.

50.     Other employees within Mr. Brown's division worked a daily schedule of 6:30 a.m. to 3

p.m.

51.     It was important to Mr. Brown's recovery from his stroke that he maintained the same

schedule upon his return to work.

52.     Relying on his previous schedule, Mr. Brown had scheduled his biweekly rehabilitation

appointments for 3:30 p.m.

53.     The clinic at which Mr. Brown scheduled his rehabilitation appointments did not

schedule any appointments later than 3:30 p.m.

54.     Arriving for work at 6:30 a.m. and leaving at 3:00 p.m. allowed Mr. Brown to attend his

rehabilitation appointments.

55.     Mr. Brown's stroke put him at greater risk of having an accident while driving.

56.     Arriving for work at 6:30 a.m. and leaving at 3:00 p.m. reduced the risk that Mr. Brown

had an accident while driving.

57.     After Mr. Brown returned to work from his stroke, Ms. Marques de Castilla insisted that

he arrive for work no earlier than 8 a.m.

58.     Mr. Brown explained the importance of maintaining his earlier arrival time to Ms. Marques de Castilla.

59.     Ms. Marques de Castilla refused to allow Mr. Brown to resume his former schedule.

60.     Upon information and belief, Ms. Marques de Castilla did not modify the hours of any of the other employees whom she supervised.

61.     After Mr. Brown returned to work from his stroke, it was important for Mr. Brown to have a stable and predictable work environment.

62.     Mr. Brown explained to his supervisors the importance of a stable and predictable work environment, including clear and consistent job expectations, because of the effects of his stroke.

63.     For example, on July 12, 2017, Mr. Brown reminded Ms. Marques de Castilla that he was suffering cognitive issues such as memory loss, confusion, and slurred speech as an effect of his stroke and asked to work on one assignment at a time.

64.     From July through December 2017, Ms. Marques de Castilla subjected Mr. Brown to constantly changing job expectations.

65.     Ms. Marques de Castilla assigned Mr. Brown tasks that were impossible for him to complete.

66.     Ms. Marques assigned Mr. Brown tasks that were inappropriate for his grade level and training.

67.     Other times, Ms. Marques de Castilla assigned Mr. Brown no tasks at all.

68.     Mr. Brown asked Ms. Marques de Castilla for clarification or instructions as to how to perform the tasks for which he was not qualified or provided training or instruction.

69.     Ms. Marques de Castilla responded that someone of Mr. Brown's grade level should know how to perform the tasks she assigned him.

70.     Ms. Marques de Castilla refused to provide further instruction or clarification.

71.     Mr. Brown was forced to ask other employees for assistance.

72.     Ms. Marques de Castilla criticized Mr. Brown for requesting assistance from other employees.

73.     Ms. Marques de Castilla ordered Mr. Brown to perform tasks that violated his doctor's instructions.

74.     In July of 2017, Ms. Marques de Castilla ordered Mr. Brown to carry a box of contracts from the second floor to third floor of a Library of Congress building.

75.     When Mr. Brown reminded Ms. Marques de Castilla of his doctor's instructions that he avoided bending or lifting, Ms. Marques insisted that he carry out her order any way.

76.     Mr. Brown complied.

77.     On July 11, 2017, as a complication of his stroke, Mr. Brown suffered a personal accident, of a sensitive nature, at his desk.

78.     Because Ms. Marques de Castilla was not at her desk at the time, Mr. Brown informed her by email of the situation before leaving to obtain a change of clothing.

79.     Ms. Marques de Castilla never replied to his email, instead marking Mr. Brown as absent without leave, in prominent letters, by his name on the attendance register.

80.     In late July 2017, Defendant still had not granted any of the accommodations requested by Mr. Brown, and the stress of his working conditions had worsened his cognitive issues and caused him great stress and anxiety.

81.     At a loss for what to do, Mr. Brown emailed Ms. Marques de Castilla, copying Colleen Shogan and other higher-level officials within LOC.

82.    The email related that since returning to work, Mr. Brown had repeatedly requested accommodations for his disability.

83.    The email related that Mr. Brown's supervisors denied or did not respond to his requests for accommodations for his disability.

84.    The email requested accommodations such as a modified work schedule and clear job expectations in writing.

85.    Ms. Shogan responded to Mr. Brown by email dated August 1, 2017.

86.    Ms. Shogan's response did not acknowledge Mr. Brown's disability or outstanding requests for a reasonable accommodation.

87.    Ms. Shogan's response criticized Mr. Brown for behaving unprofessionally by going outside the chain of command.

88.    In early September 2017, Ms. Marques de Castilla falsely accused Mr. Brown of spending four hours a day on his cell phone.

89.    Mr. Brown was receiving therapy for speech issues caused by his stroke at the time and could not have spent four continuous hours talking.

90.    On September 13, 2017, Mr. Brown informed Ms. Marques de Castilla that he only uses his phone to conduct required check-ins with his doctor, during breaks.

91.    Later in the day, on September 13, 2017, Ms. Marques de Castilla and NIO Director Joseph Cappello convened a meeting with Mr. Brown to discuss his performance.

92.    Mr. Brown was not due for a performance review at the time.

93.    At the meeting, Ms. Marques de Castilla accused Mr. Brown of spending four hours on a personal phone call.

94.     Mr. Brown reminded Ms. Marques de Castilla of his speech issues and stated that her accusations were untrue.

95.     Mr. Cappello stated that Ms. Marques de Castilla and Mr. Brown would have to agree to disagree.

96.      On September 22, 2017, Ms. Marques de Castilla called a meeting with Mr. Brown.

97.     At the meeting, Ms. Marques de Castilla provided Mr. Brown a memorandum entitled "Progress Review Conversation," which was dated September 19, 2017.

98.     The memorandum stated that Mr. Brown "performed all of [his] assignments poorly and late[,]" accused Mr. Brown of spending an "inordinate amount of duty time conducting personal conversations on [his] cell phone[,]" and falsely stated that he had been provided clear written and verbal instructions.

99.     After the September 22, 2017 meeting, Ms. Marques de Castilla grew angry with Mr. Brown when he stated that she had not him provided clear instructions in writing.

100.     In a loud volume, Ms. Marques shouted that the reason Mr. Brown did not understand her instructions was because "his brain wasn't right" and that another employee within his team understood her instructions because that employee "had a better brain" than Mr. Brown.

101.     Mr. Brown was deeply offended by those comments. He had worked hard at his recovery from his stroke and felt that he had made substantial progress.

102.     Ms. Marques De Castilla knew about Mr. Brown's cognitive issues when she made those comments.

103.     On September 25, 2017, Ms. Marques de Castilla informed members of Mr. Brown's department that she was going on vacation for three weeks.

104.   Ms. Marques de Castilla stated that anyone who requested leave during her vacation would be marked as "AWOL."

105.   Mr. Brown asked whether this included the sick leave he had already requested for his doctor's appointments to treat his stroke.

106.   Ms. Marques de Castilla did not respond.

107.   Mr. Brown's anxiety worsened due to his uncertainty over his leave status.

108.   Mr. Brown's increased stress levels worsened the cognitive issues he was experiencing because of his stroke.

109.   On or about October 23, 2017, Mr. Brown submitted a request for an accommodation using a form provided by LOC.

110.   Mr. Brown also signed a medical release and submitted it to LOC with his request for an accommodation.

111.   The medical release was valid for 180 days after the date of submission.

112.   Along with the application, Mr. Brown submitted a letter from his primary care doctor stating that Mr. Brown's "recent medical illness" required him to attend rehabilitation services, which were "very important" to his recovery. The letter stated that earlier work hours would allow Mr. Brown to attend the rehabilitation sessions.

113.   Upon information and belief, on October 27, 2017, Ms. Marques de Castilla ended her employment with LOC.

114.   She was replaced by Melissa Blaschke, who became Mr. Brown's new supervisor.

115.   Sometime before Ms. Blaschke became Mr. Brown's new supervisor, Defendant allowed him to resume his former daily work schedule: 6:30 a.m. to 3 p.m., Monday through Friday.

116.   By memo dated January 29, 2018, Ms. Blaschke informed Mr. Brown that she was changing his daily arrival time from 6:30 a.m. to a "flexible band" of 8 a.m. to 9:30 a.m.

117.   The memo did not acknowledge Mr. Brown's disability or the fact that Mr. Brown had requested a daily start-time of 6:30 as an accommodation for his disability.

118.   The memo did not explain why allowing Mr. Brown to continue with his previous schedule would pose an undue hardship for LOC.

119.   Upon information and belief, other members of Mr. Brown's team worked from 6:30 a.m. to 3 p.m.

120.   Upon information and belief, Ms. Blaschke did not change the other members' schedules.

121.   LOC policy allows employees to work alternative "flex schedules" of 6:30 a.m. to 3 p.m., subject to their supervisor's approval, and as long as they are present during the "core hours" of 9:30 a.m. to 3 p.m.

122.   Upon information and belief, working 8:00 a.m. to 5 p.m. was not an essential function of Mr. Brown's job.

123.   On or about January 30, 2018, Mr. Brown asked Ms. Blaschke about the status of his request for a modified work schedule as an accommodation for his disability.

124.    Ms. Blaschke responded that LOC could not make a determination about his request because LOC did not have current information about his condition.

125.   This was the first time Mr. Brown heard anything from LOC about his October 23, 2017 request for an accommodation.

126.   Mr. Brown asked Ms. Blaschke why additional documentation was necessary.

127.   Ms. Blaschke responded that the information provided by Mr. Brown's doctor was untimely and incomplete.

14

128.   Ms. Blaschke stated that Mr. Brown's documentation was untimely because FMLA leave
is based on the calendar year.

129.   Ms. Blaschke did not explain why the information was untimely or incomplete for
purposes of accommodating Mr. Brown's disability, as opposed to FMLA purposes.

130.   Mr. Brown's medical release was valid through late April 2018.

131.   Mr. Brown's request was not untimely.

132.   On or about February 1, 2018, Mr. Brown explained to Ms. Blaschke that the schedule
change interfered with his appointments, and that it was very difficult for him to reschedule
appointments with the VA.

133.   Nonetheless, Ms. Blaschke continued to refuse to allow Mr. Brown to arrive for work at
6:30 a.m., even on the days he had medical appointments.

134.   On February 12, 2018, Mr. Brown emailed Vicki Magnus, an EEO Officer with LOC, to
complain about harassment by his supervisors, and the fact that his hours were changed.

135.   On or about February 15, 2018, Mr. Brown asked Mr. Cappello to be restored to his
former work schedule of 6:30 a.m. to 3 p.m.

136.   Ms. Blaschke informed Mr. Brown that she would consider allowing Mr. Brown to arrive
no earlier than 7 a.m. on the day of his medical appointments, if Mr. Brown provided
advanced notice and documentation of those appointments.

137.   Brown would not be able to make his rehabilitation appointments scheduled for 3:30 p.m.
if he arrived for work at 7 a.m.

138.   Ms. Blaschke's scheduling policy required Mr. Brown to cancel his rehabilitation
appointments, and schedule new ones with the VA.

139.   Upon information and belief, scheduling appointments with the VA is a lengthy process.

140.   Because of Ms. Blaschke's schedule change, Mr. Brown missed rehabilitation appointments which were critical to his recovery.

141.   In mid-February 2018, Mr. Brown elected to pursue Alternative Dispute Resolution with Ms. Blaschke.

142.   Ms. Blaschke refused to attend the mediation sessions.

143.   On or about March 1, 2018, Ms. Blaschke issued Mr. Brown a negative performance evaluation.

144.   The evaluation mischaracterized Mr. Brown's performance and did not mention any of his accomplishments.

145.   The negative performance evaluation did not mention Mr. Brown's disability.

146.   The negative performance evaluation did not acknowledge Mr. Brown's unmet requests for an accommodation.

147.   Upon information and belief, the negative performance evaluation was issued in retaliation against Mr. Brown for his complaints about Ms. Blaschke to the EEO Office and his requests for an accommodation.

148.   From March 5, 2018 through March 8, 2018, Mr. Brown attended a training conference.

149.   Ms. Blaschke had approved of Mr. Brown's request to attend the conference.

150.   The conference was held at a building which required Mr. Brown to ascend a steep incline to reach.

151.   Mr. Brown reported to work at 7 a.m. each day of the conference, in order to allow enough time to check-in, walk to the building at which the conference was held, and prepare for the conference.

152.   On March 8, 2018, after Mr. Brown had signed in for the last day of the training

conference, Ms. Blaschke sent Mr. Brown an email stating that he should not have signed in

early for the conference.

153.   Mr. Brown responded that the reason for his 7 a.m. arrival was to allow sufficient time to

report to work and then walk to and prepare for the conference.

154.   Mr. Brown reminded Ms. Blaschke that he had difficulty walking because of his stroke.

155.   On or about March 14, 2018, Ms. Blaschke called a meeting with Mr. Brown to issue him

a letter of reprimand.

156.   The letter of reprimand charged Mr. Brown with violating LOC regulations for signing in

to work at 7 a.m. in order to attend the training conference.

157.   The letter of reprimand stated that it should not have taken Mr. Brown so long to walk to

the building at which the conference was held.

158.   The reprimand stated that if Mr. Brown was experiencing a health-related issue affecting

his conduct, he should report it to LOC and request assistance.

159.   Mr. Brown's physical limitations and requests for reasonable accommodations were

known to the Library at that time.

160.   Upon information and belief, Ms. Blaschke issued the reprimand in retaliation against Mr.

Brown for his complaints to the EEO Office and requests for an accommodation.

161.   During the March 14, 2018 meeting, Mr. Brown attempted to discuss his disability and

requests for an accommodation.

162.   Ms. Blaschke prohibited Mr. Brown from raising his concerns, stated that the meeting was

over and ordered him to leave.

163.   On or about March 15, 2018, Mr. Cappello called Mr. Brown to discuss the March 14 meeting.

164.   Mr. Cappello instructed Mr. Brown to go home on administrative leave. Mr. Brown complied.

165.   Upon information and belief, LOC caused the United States Capitol Police Department to place a "Be on the Lookout" or "BOLO" on Mr. Brown.

166.   Upon information and belief, LOC asked the Capitol Police to apprehend Mr. Brown if they saw him attempt to enter LOC premises.

167.   On or about March 16, 2018, Mr. Brown received a letter signed by Rachael Bouman, LOC's Director of Human Resources.

168.   The letter stated that due to Mr. Brown's conduct during the March 14 meeting, Dr. Sandra Charles, a doctor employed by LOC, had determined that Mr. Brown was a threat to himself and others.

169.   The letter stated that the Library was placing Mr. Brown on paid administrative leave March 19 - 27, 2018; enforced leave status March 28, 2017 until his accrued leave exhausted; and indefinite suspension of duty without pay thereafter until Mr. Brown produced medical documentation establishing that he did not pose a threat to himself or others.

170.   Dr. Charles never met with Mr. Brown personally.

171.   Dr. Charles never asked Mr. Brown for his version of the events in question and did not directly observe his psychological condition.

172.   Before issuing the letter, LOC did not give Mr. Brown an opportunity to explain his version of the events in question or respond to Ms. Blaschke's allegations.

173.   Mr. Brown did not pose a threat to himself or others.

174.  Mr. Brown never threatened to harm anyone at LOC.

175.  LOC did not form a reasonable belief that Mr. Brown was a direct threat to the safety of

others.

176.  The BOLO and barring order were well known to Mr. Brown's colleagues at LOC,

subjecting him to humiliation and indignity.

177.  On or about March 23, 2018, Mr. Brown provided LOC a letter from a psychiatrist who

had treated him stating that Mr. Brown was psychiatrically stable and did not pose a threat to

himself or others.

178.  On March 23, 2018, Mr. Brown's doctor addressed to Defendant a letter explaining Mr.

Brown's physical and cognitive limitations and requesting various workplace modifications

to accommodate them.

179.  The accommodations requested by Mr. Brown's doctor in the March 23, 2018 letter

included:  A consistent work schedule of 6:30 to 3 p.m. daily, because Mr. Brown's energy,

focus, concentration, and visual acuity were best earlier in the day and worsened as the day

progressed; clear written instructions from his supervisor, which would address "cognitive

issues due to the late effects of the stroke" and "allow Mr. Brown to master any new duties

and to perform more effectively at his current job"; additional time to move from one area to

another, due to his ongoing balance and mobility issues; avoiding heavy lifting or strenuous

work; and a stable and predictable work environment.

180.  Mr. Brown returned to work on March 28, 2018.

181.  On April 4, 2018, Mr. Brown submitted a request for an accommodation using the form

provided by Defendant.  He asked to be returned to his previous flex-time schedule and that

consideration be made to the physical limitations listed by his doctor.

182.   Mr. Brown included the March 23, 2018 doctor's letter with his request.

183.   On or about April 16, 2018, Mr. Brown emailed Melissa Blaschke and Laurie Neider, the Executive Director of FEDLINK, about the status of his most recent accommodation request.

184.   On April 17, 2018, Ms. Neider responded that she needed additional time to review Mr. Brown's documentation and discuss it with Mr. Brown's supervisor. She instructed him to continue working his current schedule until further notice.

185.   On or about May 8, 2018, Mr. Cappello delivered to Mr. Brown a Notice of Proposed Adverse Action.

186.   The Notice of Proposed Adverse Action accused Mr. Brown of misconduct during the March 14, 2018 meeting and proposed suspending his employment for ten days as a penalty.

187.   The Proposed Adverse Action was informed by statements that Ms. Blaschke had made about Mr. Brown to Mr. Cappello.

188.   Mr. Cappello did not consult with Mr. Brown to determine whether those statements were true.

189.   The Notice listed, as an example of Mr. Brown's misconduct, his attempt to discuss topics unrelated to the reprimand at the March 14, 2018 meeting.

190.   The topics Mr. Brown had attempted to discuss were his disability and his need for an accommodation.

191.   The Notice made no mention of Mr. Brown's requests for an accommodation, or his disability, even where appropriate to do so.

192.   LOC and/or Office of Personnel Management regulations call for the person issuing a Notice of Proposed Adverse Action to assess the employee's mitigating circumstances, such as any mental impairment.

193.   Despite Mr. Brown's disability and known cognitive limitations, the Notice of Proposed
       Adverse Action stated that there were no mitigating circumstances and that Mr. Brown
       showed no potential for rehabilitation.

194.   Mr. Brown's work conditions caused him severe anxiety and depression.

195.   Mr. Brown's work conditions worsened the cognitive issues and pseudobulbar effect,
       which he faced as a result of his stroke.

196.   Mr. Brown's work conditions interfered with his job performance.

197.   Due to the stress Mr. Brown faced at work, his physician advised that he retire, warning
       him that if he continued to work, he would risk another life-threatening stroke.

198.   In late May or early June 2018, Mr. Brown acted on his doctor's advice and announced his
       retirement to LOC.

199.   On September 18, 2018, Mr. Brown's physician addressed to Defendant a letter stating
       Mr. Brown's work environment worsened the long-term effects of his stroke and that Mr.
       Brown's physician had recommended that he retire.

## COUNT I: FAILURE TO ACCOMMODATE

200.   All of the allegations contained in the foregoing paragraphs of this Complaint are
       incorporated by reference herein as if the same were set forth at length.

201.   Mr. Brown is an individual with a disability within the meaning of the Rehabilitation Act.

202.   Defendant was aware of Plaintiff's disability.

203.   Between June 2017 and May 24, 2018, Mr. Brown requested multiple modifications to his
       working conditions including, but not limited to:  Reassignment to a vacant position; to be
       returned to his former schedule of 6:30 a.m. to 3 p.m., Monday through Friday; teleworking;
       a list of clear job duties in writing; and avoidance of tasks requiring bending and lifting.

204.  LOC did not timely respond to Mr. Brown's request for an accommodation.

205.  LOC did not provide Mr. Brown any of the accommodations he requested.

206.  LOC did not offer or suggest an effective alternative accommodation.

207.  LOC did not request additional medical documentation as necessary to identify an appropriate accommodation for Mr. Brown.

208.  Mr. Brown signed medical releases which enabled LOC to seek additional information from Mr. Brown's doctors, if it wanted to.

209.  When denying many of Mr. Brown's requests, LOC staff treated Mr. Brown as if he were any other employee, without acknowledging his disability.

210.  When denying Mr. Brown's requests, LOC staff did not explain why they would pose an undue hardship.

211.  LOC staff refused meetings and discussions with Plaintiff about his disability and need for an accommodation.

212.  With a reasonable accommodation, Mr. Brown would have been able to perform the essential functions of his job.

213.  Defendant failed to make a good faith effort to identify an appropriate accommodation for Plaintiff.

214.  Defendant failed to engage in the interactive process and/or caused the breakdown of the interactive process.

215.  Defendant wrongfully denied Mr. Brown a reasonable accommodation for his disability, in violation of the Rehabilitation Act and the CAA.

216.  As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

217.    Defendant's actions were committed with malice and/or reckless indifference to Plaintiff's federally-protected rights.

## COUNT II:  UNLAWFUL MEDICAL EXAMINATION

218.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

219.    LOC forced Mr. Brown to submit to a psychiatric evaluation as a condition of returning to work.

220.    Mr. Brown's forced psychiatric evaluation was a medical inquiry under the Rehabilitation Act or ADA.

221.    Mr. Brown's forced psychiatric evaluation was not job related or consistent with business necessity.

222.    LOC did not have an objectively reasonable basis for concluding that Mr. Brown was a direct safety threat to himself or others.

223.    Mr. Brown's forced psychiatric evaluation violated the Rehabilitation Act and the CAA.

224.    As a result of Mr. Brown's forced psychiatric evaluation, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

225.    Defendant's actions were committed with malice and/or reckless indifferent to Mr. Brown's federally protected rights.

## COUNT III: DISCRIMINATION ON THE BASIS OF A DISABILITY

226.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

227.    Plaintiff has a disability within the meaning of the Rehabilitation Act.

228.    Plaintiff was able to perform the essential functions of his job with a reasonable accommodation.

229.    Defendant materially altered the terms and conditions of his employment, by such actions as:  changing Plaintiff's work hours against his doctor's advice, substantially reducing Plaintiff's job responsibilities, issuing a letter of official reprimand, suspending Plaintiff's employment, barring Plaintiff from LOC, conditioning Plaintiff's return to employment on undergoing an unnecessary psychiatric evaluation, and issuing a letter of proposed adverse action.

230.    At the time of the above-listed adverse actions, Plaintiff was performing satisfactorily.

231.    Defendant committed the above-listed adverse actions because of Mr. Brown's disability.

232.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

233.    Defendant's actions were committed with malice and/or reckless indifference to Plaintiff's federally-protected rights.

## COUNT IV: RETALIATION

234.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

235.    Plaintiff lodged informal and formal complaints about Defendant's discrimination, denial of a reasonable accommodation, retaliation, and harassment to Defendant's EEO Office.

236.    Plaintiff requested accommodations for his disability.

237.    Plaintiff's informal and formal complaints and requests for an accommodation are protected activities.

238.    Defendant was aware of Plaintiff's protected activities.

239.    Shortly after Plaintiff's complaints and requests for an accommodation, Defendant

materially altered the terms and conditions of his employment, by such actions as:  changing

Plaintiff's work hours against his doctor's advice, substantially reducing his job responsibilities,

issuing a letter of official reprimand, suspending Plaintiff's employment, barring Plaintiff from

LOC, conditioning Plaintiff's return to employment on Plaintiff undergoing an unnecessary

psychiatric evaluation, and issuing a notice of proposed adverse action.

240.    The above-cited adverse actions were causally related to Plaintiff's protected activity.

241.    The above-cited adverse actions would have dissuaded a reasonable worker from opposing

Defendant's unlawful discriminatory and harassing conduct.

242.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both

economic and non-economic losses, emotional distress, and other compensable damages.

243.    Defendant's actions were committed with malice and/or reckless indifference to Plaintiff's

federally-protected rights.

## COUNT V: HOSTILE WORK ENVIRONMENT

244.    All of the allegations contained in the foregoing paragraphs of this Complaint are

incorporated by reference herein as if the same were set forth at length.

245.    Plaintiff has a disability within the meaning of the Rehabilitation Act.

246.    Plaintiff was able to perform the essential functions of his job.

247.    Plaintiff requested reasonable accommodations for his disability and engaged in other

protected activities such as making EEO Complaints.

248.    Plaintiff's supervisors permeated Plaintiff's work environment with insulting and

degrading treatment, including, but not limited to:  making disparaging remarks about Plaintiff's

disability and negative comparisons between Plaintiff and a  co-worker who did not suffer from

the same mental impairment; ordering Plaintiff to perform tasks that violated his doctor's instructions and which Defendant knew or should have known would exacerbate his disability; providing conflicting, inconsistent and unclear work assignments despite Defendant's awareness of Mr. Brown's cognitive difficulties and repeated requests for clear written instructions; assigning Plaintiff tasks that were impossible to complete; making unsolicited recommendations that Plaintiff retire in response to Plaintiff's requests for an accommodation; shouting at Plaintiff and chastising him for requesting an accommodation; marking Plaintiff as AWOL when Plaintiff had informed his supervisor that he had been required to leave his desk to attend to a personal emergency of a sensitive nature, that was related to his disability; unreasonably delaying its response to Plaintiff's request for an accommodation; imposing unnecessary forced medical leave based on unfounded allegations that Plaintiff posed a threat to himself and others; barring Plaintiff from LOC; requiring Plaintiff to submit to an unnecessary psychiatric evaluation; causing United States Capitol Police Department to place a BOLO on Plaintiff; issuing negative, untimely performance evaluations for time periods in which Plaintiff had a disability and was not provided a reasonable accommodation; and proposing an adverse action against Plaintiff as a penalty for attempting to discuss his disability and his unmet need for an accommodation with his supervisor.

249.    Defendant's harassment of Plaintiff occurred because of his disability and requests for an accommodation.

250.    Defendant's harassment of Plaintiff was unwelcomed by Plaintiff.

251.    The harassment was severe and pervasive.

252.    A reasonable person in Plaintiff's position would find his work environment to be hostile and abusive.

253.     Plaintiff believed his work environment to be hostile and abusive as a result Defendant's

conduct.

254.     Defendant's conduct caused Plaintiff anxiety, panic attacks, depression, and Post

Traumatic Stress Disorder and worsened his pseudobulbar affect.

255.     Plaintiff's work environment interfered with his ability to perform his job duties.

256.     Defendant's conduct made Plaintiff unable to continue working without placing his health

at risk.

257.     Defendant's conduct resulted in Plaintiff's constructive discharge.

258.     As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both

economic and non-economic losses, emotional distress, and other compensable damages.

259.     Defendant's actions were committed with malice and/or reckless indifference to Plaintiff's

federally-protected rights.

## COUNT VI: CONSTRUCTIVE DISCHARGE

260.     All of the allegations contained in the foregoing paragraphs of this Complaint are

incorporated by reference herein as if the same were set forth at length.

261.     Defendant deliberately made Plaintiff's working conditions intolerable because of his

disability, age, and protected activities.

262.     Plaintiff's working conditions were so intolerable that a reasonable person in Plaintiff's

position would have felt compelled to resign

263.     Plaintiff's working conditions were so intolerable and caused Plaintiff such distress that

his doctor warned him that if he continued his employment, he could face a life-ending stroke.

264.     As a result of Defendant's actions, Plaintiff was forced to resign.

265.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

266.    Defendant's actions were committed with malice and/or reckless indifference to Plaintiff's federally-protected rights.

## COUNT VII:  ADEA -- DISPARATE TREATMENT

267.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

268.     Plaintiff is an individual over the age of 40.

269.    Defendant made unsolicited recommendations that Plaintiff retire.

270.     Defendant denied Plaintiff's requests for an accommodation, placed Plaintiff on suspension, gave him a negative performance evaluation, and issued him a notice of proposed adverse action, due to his age.

271.    Upon information and belief, Defendant did not subject similarly-situated employees who were substantially younger than him to the same treatment.

272.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

## COUNT VIII
(Fifth Amendment – Equal Protection)
(Plead as an Alternative to CAA, Rehabilitation Act and ADEA)

273.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

274.    In the event that this Court rules that Plaintiff cannot state a claim for disability discrimination under the CAA or Rehabilitation Act or age discrimination in violation of the

ADEA, Plaintiff alleges that, for reasons listed in this complaint, Defendant's actions violate the Fifth Amendment's Due Process Clause.

275.    Defendant purposefully and intentionally discriminated against Plaintiff because he has a disability and is over the age of 40, and in doing so, acted arbitrarily, irrationally and without constitutionally sufficient justification.

276.    By engaging in irrational and arbitrary discrimination, Defendant violated clearly established constitutional rights of which a reasonable person would have known.

277.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

278.    Defendant's actions were committed with malice and reckless disregard for Plaintiff's rights.

## COUNT VIII:  LIBRARY OF CONGRESS REGULATION LCD 9-130.1

279.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

280.    Defendant harassed Plaintiff because of his disability, age, and protected activity.

281.    Defendant retaliated against Plaintiff because of his disability, age, and protected activity.

282.     Defendant's harassment of Plaintiff and retaliation violates LOC Regulation LCD 9-130.1, Anti-Harassment and Retaliation Policy.

283.    As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

284.    Defendant's actions were committed with malice and reckless disregard for Plaintiff's rights.

## **PRAYER FOR RELIEF**

A.      An Entry of judgment in favor of Plaintiff against Defendant;

B.      Back pay;

C.      Compensatory damages;

D.      Punitive damages;

E.      Pre-judgment interest as may be allowed by law;

F.      Attorney's fees and costs; and

Other such relief as may be appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: November 6, 2018

                                        Respectfully submitted,

                                        /s/ Denise M. Clark
                                        Denise M. Clark (420280)
                                        Clark Law Group, PLLC
                                        1100 Connecticut Ave., N.W.
                                        Suite 920
                                        Washington, D.C. 20036
                                        (202) 293-0015
                                        dmclark@benefitcounsel.com