UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CLARK H. BROWN,

               Plaintiff,

               v.

CARLA HAYDEN,
      *in her capacity as Librarian of
      Congress*,

               Defendant.

Civil Action No. 18-2561 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff Clark Brown brings this employment discrimination lawsuit against his former employer, the Library of Congress ("LOC"), claiming that LOC failed to provide reasonable accommodations for a disability, discrimination on the basis of disability, retaliation for engaging in protected activity, a hostile work environment, an unlawful medical examination, and constructive discharge, all in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701 *et seq.*, and the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301 *et seq.*  Compl. ¶¶ 200–266, ECF No. 1.  Plaintiff also claims age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, *id.* ¶¶ 267–72; age- and disability-based discrimination, in violation of the Fifth Amendment to the U.S. Constitution and LOC's own internal regulations, *id.* ¶¶ 273–84; and harassment and retaliation, in violation of LOC's internal regulations, *id.* ¶¶ 279–84.  These claims arise from plaintiff's alleged treatment by his direct supervisor and then her replacement after he suffered a stroke resulting in his disability and undertook protected activity in connection with that disability.  *See id.* ¶¶ 15–199.  Following ten months of discovery, *see* Scheduling Orders (Mar.

21, 2019 and Oct. 15, 2019); Scheduling Order (Nov. 26, 2019) (extending discovery cutoff until January 31, 2020), the parties have filed cross-motions for summary judgment. *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 19; Def.'s Mem. Supp. Summ. J. ("Def.'s Mem."), ECF No. 19-1; Pl.'s Cross-Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 20; Pl.'s Mem. Supp. Cross-Mot. Partial Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 20-1.  For the reasons set forth below, LOC's motion is granted and plaintiff's motion is denied.

## I.   BACKGROUND

The factual allegations underlying plaintiff's claims are described first followed by a summary of plaintiff's various administrative complaints culminating in the instant suit.

### A.   Factual Background

Plaintiff, a 64-year-old man, worked at LOC for sixteen years, until his retirement on June 15, 2018.  Def.'s Statement of Material Facts ("Def.'s SMF") ¶¶ 1, 4, ECF No. 19-2; Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶¶ 1–2, ECF No. 20-1.  For most of his career at LOC, plaintiff worked at LOC's Federal Library Information Network ("FEDLINK") Division, which is responsible for developing and sharing educational and informational resources for federal libraries and their staffs.  Def.'s SMF ¶¶ 1, 4–5; Pl.'s SMF ¶¶ 1–2.  The issues plaintiff complains about in this lawsuit occurred in the last year of his employment at LOC, after he suffered a stroke in April 2017.  Def.'s SMF ¶ 9; Pl.'s SMF ¶ 3.  Plaintiff's colleagues were aware of the stroke, which caused cognitive difficulties as well as a reduction in his motor control, necessitating his use of a cane.  Pl.'s SMF ¶¶ 4–6; Def.'s Response to Pl.'s SMF ("Def.'s Resp. SMF") at 2–5, ECF No. 25-3.

#### 1.   *Plaintiff's Initial Accommodations Requests*

The month after his stroke, plaintiff requested, on May 10, 2017, and LOC approved, advanced sick leave, to allow him to return to work on a partial basis and to leave work for

therapy appointments.  Def.'s SMF ¶¶ 11–12; Pl.'s Ex. 9.  He also requested, and LOC approved, participation in the Voluntary Leave Transfer Program, giving him access to other employees' unused leave days.  Def.'s SMF ¶ 12; Pl.'s SMF ¶ 8.  In support of his additional leave request under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, separate from his advanced sick leave request, plaintiff submitted medical documentation indicating that he had difficulty "emailing, typing, writing, [and] talking" and that he would need to leave work for rehabilitative therapy twice a week.  Def.'s SMF ¶ 14.  LOC granted plaintiff's request for FMLA leave.  Def.'s SMF ¶ 15.

On June 16, 2017, less than two months after his stroke, plaintiff requested permission to telework because of the effects of his stroke.  Def.'s SMF ¶ 17; Pl.'s SMF ¶ 16.  LOC denied the request, citing the large volume of work at FEDLINK and stating that plaintiff "cannot sufficiently complete [his] assigned tasks without further training and oversight."  Def.'s SMF ¶ 17.  LOC never subsequently provided such training.  Pl.'s SMF ¶ 17.  LOC agreed, however, to permit plaintiff to arrive at work as early as 6:30 AM, which was the time plaintiff had always arrived at work before his stroke, to help ensure that he could attend his therapy appointments. Pl.'s SMF ¶¶ 12–13.  LOC also helped facilitate plaintiff's return to work by bringing him files he would have had difficulty retrieving himself and providing him with assistive technologies. *Id.* ¶¶ 10–11.

Plaintiff returned to work on June 26, 2017, on a two-day per week schedule, working for four hours each day.  Def.'s SMF ¶ 18.  On June 28, plaintiff emailed his supervisors informing them that he usually started his workday at 6:30 AM and asking for "a defined list of [his] proposed duties in writing" in order to "know what [he was] being evaluated on."  Def.'s SMF ¶ 19; Pl.'s SMF ¶ 18.  The following day, he wrote another email to his supervisors requesting

transfer out of FEDLINK "[d]ue to [his] current medical condition and the undue stress" in FEDLINK.  Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20.  His direct supervisor at the time, Georgette Harris, responded roughly a week later.  She did not grant the request, explaining that "at this time FEDLINK has more than enough work to keep everyone busy."  Def.'s Ex. 21 (July 3, 2017 Email from Georgette Harris to plaintiff), ECF No. 19-23.  On June 29, 2017, plaintiff requested additional advanced sick leave, which was denied on the grounds that FEDLINK had a high workload requiring employees to be physically present.  Def.'s SMF ¶ 21; Pl.'s SMF ¶ 21.  On the form denying plaintiff's advanced sick leave request, the Director of Human Resources noted that plaintiff was "[c]onsidering disability retirement," although plaintiff indicated on the same form that he was not.  Pl.'s Ex. 17 (June 29, 2017 Request for Advance Sick Leave), ECF No. 21.[1]

In July 2017, Isabella Marques de Castilla became plaintiff's direct supervisor, and on July 5, 2017, she sent him an email reiterating that his reassignment request had been denied because of FEDLINK's high volume of work and requiring him to report to work at 8:30 AM on the two days per week that he worked, rather than at 6:30 AM.  Def.'s SMF ¶¶ 24–26; Pl.'s SMF ¶¶ 22–25.  As Castilla explained in the email, "given [plaintiff's] limited duty schedule, [his] presence in the office is required at a time when other FEDLINK personnel are also present in order to communicate and collaborate with [him] on mission requirements and deadlines."  Def.'s Ex. 24 (July 5, 2017 Email from Isabella Marques de Castilla to plaintiff), ECF No. 19-26.

---

[1]     On a separate earlier occasion, plaintiff had requested information from a Human Resources employee about disability retirement, although plaintiff characterizes this inquiry as "exploratory," undertaken to learn about his options. Def.'s SMF ¶ 31; Pl.'s Response to Def.'s SMF ("Pl.'s Resp. SMF") at 16, ECF No. 20-1.

## 2.   *Plaintiff's Job-Related Difficulties from June to October 2017*

Plaintiff had a difficult working relationship with Castilla.  On July 11, 2017, plaintiff soiled himself at his workstation because of the effects of his stroke and he left to change his clothes, requesting leave for the remainder of the day.  Def.'s SMF ¶ 30; Pl.'s SMF ¶ 33.  When he returned to his workstation after changing, he claims that he found a sticky note from Castilla indicating that his requested leave was disapproved and would be without pay.  Dep. of Plaintiff ("Pl.'s Dep.") at 85:19–22, ECF No. 23-1.  Plaintiff asked Castilla about the note and she made a joke about it, which plaintiff says left him feeling humiliated.  *Id.* at 85:23–86:9. Plaintiff's leave request for that day was ultimately approved, however.  Def.'s SMF ¶ 30; Pl.'s Resp. SMF at 15.

For the remainder of the summer and into the fall of 2017, plaintiff's relationship with Castilla continued to sour.  He often asked Castilla for clarification regarding assignments, drawing her impatience.  Pl.'s SMF ¶ 35.  For instance, on one occasion, plaintiff emailed Castilla that he did not understand a certain assignment; she responded that she "ha[d] given [him] everything [he] need[ed] to process this order."  Def.'s SMF ¶ 33.  On multiple occasions, Castilla orally reprimanded plaintiff for taking phone calls.  Pl.'s SMF ¶ 37.  Plaintiff eventually asked Castilla, via email, to stop doing that, explaining that he was speaking with his doctor.  *See* Pl.'s Ex. 25 (Sept. 13, 2017 Email from plaintiff to Isabella Marques de Castilla), ECF No. 21-1. Later the same day, at a performance meeting, Castilla allegedly accused plaintiff of spending four hours on a personal phone call—a call plaintiff claims would have been impossible given his speech difficulties following his stroke.  *See* Pl.'s Opp'n at 25.

From LOC's perspective, plaintiff struggled to complete his assigned work.  For instance, on July 5, 2017, Castilla wrote to plaintiff regarding an assignment and included written directions.  Def.'s SMF ¶ 28.  She followed up roughly two weeks later when the assignment remained incomplete, stating that this task should have taken plaintiff only six or eight hours to

complete and directing him to send it to her that day.  *Id.* ¶ 34.  A few days later, with the assignment still incomplete, Castilla expressed frustration that plaintiff was waiting for responses from various contacts to complete the assignment instead of proactively seeking other tasks to do in the interim.  *Id.* ¶ 37.  Later in July, plaintiff received a separate assignment described as a "simple task" and was instructed to complete it by the following day.  He did not do so, explaining that this was the first time he had performed the assigned task and had not received adequate instructions on how to complete it.  *Id.* ¶ 49.

On August 7, 2017, plaintiff received another assignment involving the processing of a long list of invoices and communicating with LOC vendors as needed, but this proved to be a source of increased friction between plaintiff and Castilla.  *Id.* ¶ 43–44; Pl.'s Resp. SMF at 17. Castilla explained that each account should take roughly 20 minutes to process.  Def.'s SMF ¶ 43; Pl.'s Resp. SMF at 17.  The following day, plaintiff emailed her a list of questions about the assignment, prompting Castilla's response to those questions and subsequent answers to plaintiff's follow-up questions.  Def.'s SMF ¶¶ 46–48; Pl.'s Resp. SMF at 17.  Plaintiff also sent questions about the assignment to other FEDLINK employees, not all of which questions were answered.  Def.'s SMF ¶ 49.  Instead, Castilla emailed him chastising him for "spending time asking lower grade staff about how to do your assignment."  Pl.'s Ex. 52 (Sept. 7, 2017 Email from Isabella Marques de Castilla to plaintiff), ECF No. 21-4.  When plaintiff asked Castilla for clarification regarding the instructions for the invoice-processing assignment, he contends that she responded by stating that another employee had received similar instructions and had no trouble understanding them because the other employee "had a better brain" than plaintiff and that plaintiff "obviously couldn't understand her instructions because [his] brain wasn't right." Pl.'s SMF ¶ 40; Def.'s Resp. SMF at 21.

In late August 2017, in connection with a performance review, Castilla wrote to plaintiff that she had randomly reviewed eight invoice-processing files he had completed, that three were incomplete, and that his "work was 50% accurate."  Def.'s SMF ¶ 53; Pl.'s Resp. SMF at 18. Plaintiff was instructed to complete the unfinished invoicing files by September 6, 2017.  Def.'s SMF ¶ 54.  Plaintiff responded that he thought that deadline was unrealistic, given that a memo he was required to send to LOC vendors in order to complete the assignment, and which Castilla would provide to him, had not yet been prepared.  Def.'s SMF ¶ 55; Pl.'s Resp. SMF at 18.

Also in August, plaintiff received an email sent by Castilla to all FEDLINK employees providing instructions on moving some file cabinets in the building.  Def.'s SMF ¶ 42; Pl.'s SMF ¶ 26.  He responded roughly two weeks later that he had a "medical profile" and was "still o[n] light duty."  Def.'s SMF ¶ 42; Pl.'s Ex. 19 (Aug. 29, 2017 Email from plaintiff to Isabella Marques de Castilla), ECF No. 21.  Shortly after this exchange, Castilla asked Brown to move a box of manila folders, which he refused to do.  Pl.'s SMF ¶ 27; Def.'s Resp. SMF at 14.

In a September 7, 2017 email, Castilla detailed her frustrations with plaintiff's performance on the invoice-processing assignment.  *See* Pl.'s Ex. 52 (Sept. 7, 2017 Email from Isabella Marques de Castilla to plaintiff), ECF No. 21-4.  She noted that she had provided detailed instructions upon assigning plaintiff the task but that the task nevertheless remained incomplete nearly a month later.  *Id.*  She also criticized plaintiff for "continu[ing] to ask the same questions" notwithstanding "detailed instructions and clear guidance," that he was "spending time asking lower grade staff about how to do [his] assignment," and that, as such, plaintiff had "not shown the level of independence required of [his] GS-13 position."  *Id.*

On September 13, 2017, Castilla provided plaintiff a mid-year performance review. Def.'s SMF ¶ 62; Pl.'s Resp. SMF at 20.  According to a memorandum summarizing the meeting

written ten days later, at the performance review, Castilla informed plaintiff that he had

"performed all of [his] assignments poorly and late."  Def.'s SMF ¶ 63; Pl.'s Resp. SMF at 20.

"[A] random sample of [his] work was reviewed, and about one half of the work was done

correctly, which is far below an acceptable level of competence."  Def.'s SMF ¶ 63; Pl.'s Resp.

SMF at 20.  The memorandum concluded that plaintiff's "level of performance is not on track to

meet expectations for the annual appraisal period."  *Id.*[2]

### 3.     *Plaintiff's October 2017 Request for Accommodations*

The month after plaintiff received his poor mid-year work performance review, plaintiff

submitted, on October 25, 2017, a request of accommodation to LOC's Health Services Office,

requesting that he be allowed to return to his early arrival time, that he be provided with

additional time to perform tasks requiring "dexterity and fine motor speed," and that he not be

required to perform tasks involving "stooping, bending, lifting, and writing."  Def.'s SMF ¶ 84;

Pl.'s Ex. 20 (Jan. 30, 2018 Email from plaintiff to Melissa Blaschke, who became plaintiff's

direct supervisor in October 2017), ECF No. 21.  LOC took no action on the request, however,

and did not inform him that his accommodation request was incomplete.  Def.'s SMF ¶ 84; Pl.'s

SMF ¶ 31.  When Blaschke told him, on January 30, 2018, that his accommodations request was

missing documentation, he followed up with the Health Services Office, at which point he was

informed that the request was incomplete because he did not include the weekly frequency of his

therapy appointments or the "anticipated end date of the therapy," and his doctor had not

completed the portion of the request form required to be completed by a physician.  Def.'s SMF

¶ 84; Pl.'s Ex. 21 (Feb. 8, 2018 Email from Arlene Klauber to plaintiff), ECF No. 21.

---

[2]      Plaintiff disputes these characterizations of his work and maintains that Castilla never proved these
allegations at the September 13 meeting.  Pl.'s Resp. SMF at 20.

Once advised that his October 2017 accommodations request had not been processed, plaintiff provided LOC with further information the next week, but the request was still deemed incomplete.  Def.'s SMF ¶ 92.  In February 2018, LOC received the necessary documentation to approve plaintiff's 2018 FMLA request, which was then approved.  *Id.* ¶ 93.  Plaintiff then emailed Joe Cappello, a higher-level supervisor, asking "to be returned to [his] 6:30am-3:00pm schedule" "[i]n light of [his] current FMLA approval."  Pl.'s Ex. 32 (Feb. 15, 2018 Email from plaintiff to Joe Cappello), ECF No. 21-2; Def.'s SMF ¶¶ 95–96.  Cappello indicated that the early schedule was appropriate on the one or two days per week on which plaintiff had therapy appointments.  Def.'s SMF ¶¶ 96, 99; Pl.'s SMF ¶ 50.  In March 2018, Blaschke followed up with plaintiff indicating that he would be permitted to use his early schedule on days he had therapy appointments scheduled, so long as he provided advance notice.  Def.'s SMF ¶ 99.

On April 5, 2018, the Health Services Office finally received the necessary documentation for plaintiff's accommodation request.  *Id.* ¶ 120.  The Health Services Office wrote that plaintiff was "recovering from a severe medical condition that substantially limits one or more major life activities," and noted that he sought as accommodations: (1) clear instructions in writing of expectations and performance, (2) extra time to move from one area to another and to complete tasks, (3) a limitation on lifting, and (4) a 6:30 a.m. to 3 p.m. work schedule.  Def.'s Ex. 92 (Apr. 16, 2018 Memorandum from Arlene Klauber to Melissa Blaschke), ECF No. 19-94. This accommodations request was granted on May 8, 2018.  Def.'s SMF ¶ 126; Pl.'s SMF ¶ 64. Plaintiff was informed that he could return to his 6:30 AM start time, would not be required to engage in strenuous physical activity, would be provided a reasonable amount of time to move from one location to another, and would be provided written instructions for assignments.  Def.'s SMF ¶ 126.

### 4.    *Plaintiff's Job-Related Difficulties from October 2017 to March 2018*

As noted, at the end of October 2017, Melissa Blaschke replaced Castilla and became plaintiff's direct supervisor.  *Id.* ¶ 70.  At the time, he was arriving at work as early as 6:30 AM. *Id.* ¶ 71; Pl.'s Resp. SMF at 21; *see also* Dep. of Melissa Blaschke at 23:14–19 ("Blaschke Dep."), ECF No. 23-1.  On January 29, 2018, however, Blaschke sent plaintiff a memo informing him that she had "determined that, in the best interest of our organization's operational needs, [plaintiff's] work schedule should align more closely with the rest of the FEDLINK[] team" and, as such, plaintiff's work schedule would be changed back to an arrival time between 8:00 AM and 9:30 AM.  Def.'s SMF ¶ 78; Pl.'s SMF ¶ 46.  Plaintiff objected that his current work schedule, with its early arrival time, was a reasonable accommodation for his disability. Def.'s SMF ¶ 79; Pl.'s Resp. SMF at 22.  On January 30, 2018, Blaschke wrote back that the Health Services Office did not have all the required documentation supporting an accommodations request, including his physician's recommendations and appointment times, and directed plaintiff to contact the Health Services Office in order to provide the necessary documentation.  Def.'s SMF ¶ 81.

On February 1, 2018, Blaschke reported a conversation she had with plaintiff in which he complained to her about that he felt he was being held to an inappropriately high standard and that LOC was not adequately accounting for his disability.  *Id.* ¶ 88.  She wrote in a contemporaneous memo that plaintiff's "tone [was] heated and by the end [of the conversation] he had raised his voice, bordering on yelling."  *Id.*

On March 1, 2018, plaintiff emailed Blaschke that he would be attending a training for the entire following week, March 5 through March 9.  *Id.* ¶ 101.  Blaschke responded that the training had not been approved, but nevertheless she permitted him to attend.  *Id.*  On March 8, 2018, Blaschke emailed plaintiff reminding him of his 8:00 AM–9:30 AM arrival time and

noting that on multiple days in the preceding week, during which plaintiff attended the training, he had signed in at 7:00 AM. *Id.* ¶ 102. In justifying his early sign-in, plaintiff explained that the training began at 8:00 AM and he needed time to settle in and get to the class. *Id.* During the same week, plaintiff also failed to follow sign-in procedures, by signing in at the bottom of the sign-in sheet rather than in order of arrival from the top of the sheet down. *Id.* ¶ 103; Pl.'s Resp. SMF at 22.

### 5.   *March 14, 2018 Meeting and Plaintiff's Retirement*

On March 14, 2018, Blaschke convened a meeting with plaintiff and another LOC supervisor, Karen Caldwell, to address concerns related to the manner in which plaintiff had signed up for the training, arrived an hour before the training began, and signed in when he arrived at work, and to deliver a written policy reminder and a written reprimand. Def.'s SMF ¶ 104; Pl.'s SMF ¶ 55. The policy reminder reviewed the proper steps to request to attend a training. Def.'s SMF ¶ 105; Pl.'s Resp. SMF at 22–23. The reprimand cited plaintiff's early sign-ins during the week of the training and the fact that there was no evidence plaintiff had worked between the time he signed in and the time the class began. Def.'s SMF ¶ 106. The reprimand concluded that LOC believed plaintiff had violated its rules of conduct. Def.'s SMF ¶ 106.

Immediately following the meeting, Caldwell wrote a contemporaneous memo describing what occurred. *See* Def.'s Ex. 86 (Mar, 14, 2018 Memorandum from Karen Caldwell to Joe Cappello), ECF No. 19-88. According to the memo, plaintiff started interrupting Blaschke as she attempted to hand him the two documents. *Id.* Caldwell's memo went on to state that plaintiff "showed aggressive behavior and was in an agitated state," specifically noting that he "stood up from the table, and threw down the memos on the table very hard. . . . While the memos were not thrown at [Caldwell and Blaschke], it still felt threatening as the action was combined with his

11

loud tone and aggressive behavior."  *Id.*  In a memo she wrote the following day, Blaschke

corroborated this account of the meeting, stating that, as she attempted to leave the meeting,

plaintiff "stood up, . . . blocked the door and persisted in bringing up several issues ir[r]elevant to

the policy matter and reprimand," and that she was left "incredibly shook up after this meeting."

Def.'s Ex. 87 (Mar. 15, 2018 Memorandum from Melissa Blaschke to Joe Cappello), ECF No.

19-89.  For his part, plaintiff denies that he was aggressive at the meeting and that he blocked

Blaschke's exit from the meeting room.  Pl.'s Resp. SMF at 23.  Plaintiff also contends that

Cappello later "repeatedly badgered" him in order to get him to admit he had been angry during

the meeting.  Pl.'s SMF ¶ 57.

On March 15, 2018, the day following the meeting and the day of Blaschke's memo,

LOC directed plaintiff to go home for the remainder of the day on administrative leave and

convened a Threat Assessment Group meeting.   Def.'s SMF ¶¶ 111–12; Pl.'s SMF ¶ 58.  Present

at the meeting were Dr. Sandra Charles from the Health Services Office, the human resources

team, and Blaschke and Caldwell.  *See* Def.'s SMF ¶¶ 113–14.  Blaschke and Caldwell

recounted the prior day's meeting with plaintiff.  *Id.* ¶ 113.  Following the Threat Assessment

Group meeting, on March 16, 2018, plaintiff was informed by letter that LOC "ha[d] determined

that [plaintiff's] emotional state is such that it raises concerns about whether [he was] a danger to

[him]self or others," in light of "growing episodes of veiled threats, angry tones, and [plaintiff's]

feelings of persecution," and that it was the chief health officer's "determination that [plaintiff's]

retention in a duty status at this time may be detrimental to Library operations."  *Id.* ¶ 115; Pl.'s

SMF ¶ 59.  The letter also informed plaintiff of LOC's determination that he "should not be

permitted to return to duty status until the Library receives appropriate, objective medical

documentation from a qualified mental health professional that indicates that [plaintiff does not] present a threat or danger to [himself] or others."  Def.'s SMF ¶ 115; Pl.'s SMF ¶ 59.

Plaintiff was placed on administrative leave from March 19, 2018 through March 27, 2018.  Def.'s SMF ¶ 115; Pl.'s SMF ¶ 62.  On March 23, 2018, plaintiff provided a letter from his physician indicating that, based on a March 21, 2018 meeting with plaintiff, he was stable and had no plan to hurt himself or others.  Def.'s SMF ¶¶ 117–18; Pl.'s SMF ¶ 63.  Plaintiff returned to work but, on May 8, 2018, received a Notice of Proposed Adverse Action proposing a 10-workday suspension as a result of plaintiff's behavior at the March 14, 2018 meeting. Def.'s SMF ¶ 127; Pl.'s SMF ¶ 65.

Plaintiff retired from LOC on June 15, 2018.  Def.'s SMF ¶ 129; Pl.'s SMF ¶ 66.  In notifying Blaschke of his decision to retire, plaintiff explained that he was doing so at the recommendation of his doctor, because his stress level was too high, and because of "intolerable" conditions at work.  Def.'s SMF ¶ 128; Pl.'s SMF ¶ 67.

## B.      Procedural History

From September 2017 through October 2018, plaintiff filed six separate administrative complaints, the last of which was only a month before he filed the instant lawsuit. These administrative complaints are described in chronological order.

### 1.      *Plaintiff's September 2017 EEO Complaint*

On September 27, 2017, plaintiff filed an informal dispute complaint, assigned number 17-051, with LOC's Office of Equal Employment Opportunity and Diversity Program ("EEO/DP").  Def.'s SMF ¶¶ 65–66; Pl.'s SMF ¶ 42.  In the complaint, plaintiff explained that he had "worked for the Library for over 18 years," had recently suffered a stroke, and was seeking dispute resolution with his new supervisor, Castilla.  *See* Def.'s Ex. 48 (Informal Dispute, Sept. 27, 2017).  He listed specific interactions with Castilla that caused him to seek

13

mediation and, though many of the incidents occurred in July and August, the most recent event

on the list occurred on September 22, 2017, just a few days before the complaint was filed. *See*

*id.* On November 29, 2017, EEO/DP informed plaintiff that his informal complaint was

unresolved and that he could file a formal complaint, which he did on December 6, 2017. Def.'s

SMF ¶¶ 72–73; Pl.'s SMF ¶ 43.

This December 2017 complaint alleged discrimination based on race/color, age,

disability, and failure to accommodate. Def.'s SMF ¶ 73; Pl.'s SMF ¶ 43. In support of these

allegations, plaintiff cited changing work assignments, unrealistic deadlines for completing

work, denial of his reassignment request, being the "[o]nly employee whose work hours were

changed," "endur[ing] demeaning and disrespectful personal comments," unsolicited advice

from Castilla to retire, and being "[a]sked to violate light duty status recommended by [his]

physician." Pl.'s Ex. 27 (Dec. 6, 2017 Complaint of Discrimination), ECF No. 21-1; Def.'s SMF

¶ 73.

EEO/DP rejected the complaint as untimely, due to the inclusion of allegations occurring

more than 45 days prior to September 27, the date on which plaintiff filed the informal

complaint. *Id.* ¶ 74; Pl.'s SMF ¶ 44. Library of Congress Regulation 11-310 requires that an

employee who "has been, or is being, discriminated against . . . shall notify the EEO/DP and

consult with a Counselor not later than 45 calendar days after the date of the alleged

discriminatory event." Def.'s SMF ¶ 74. LOC noted in its letter to plaintiff that "the most recent

instance of discrimination must be within the 45 day timeline prescribed by regulation," and

acknowledged that plaintiff's complaint stated the discrimination "still continues." *Id.*

Nevertheless, the complaint was rejected because plaintiff "did not provide any date or alleged

discriminatory event within the required time for filing that would allow [his] complaint to be

accepted for investigation." *Id.*  EEO/DP also informed plaintiff that he had five days to appeal the decision, which he did not do.  *See id.*

### 2.   *Plaintiff's February 2018 EEO Complaint*

Plaintiff filed a second informal dispute with LOC's EEO/DP on February 12, 2018. This informal complaint cited Blaschke's change to plaintiff's work schedule requiring him to arrive between 8:00 AM and 9:00 AM and noted that he was the only FEDLINK employee who had his schedule changed in this way, though Blaschke had informed him that he did not have any performance issues.  *See* Def.'s Ex. 69 (Feb. 12, 2018 Informal Dispute), ECF No. 19-71. On April 25, 2018, EEO/DP informed plaintiff that the complaint had not been resolved and that he could file a formal complaint.  Def.'s SMF ¶ 122.  On April 27, 2018, plaintiff emailed EEO/DP a copy of his formal discrimination complaint, alleging discrimination based on race, sex, and disability, as well as retaliation.  *Id.* ¶ 123.  In support of these allegations, plaintiff's April 2018 formal complaint cited the March 2018 reprimand letter, being placed on administrative leave in March 2018, and Blaschke exaggerating an incident when plaintiff asked her "to stop being condescending towards [him]" and, according to Blaschke, plaintiff had "cornered her in her office."  *Id.*; Def.'s Ex. 93 (Apr. 26, 2018 Complaint of Discrimination), ECF No. 19-95.  In the body of his email to EEO/DP that forwarded the complaint, plaintiff stated that he was "going to go the route of" the U.S. Congress Office of Compliance ("OOC"). Def.'s SMF ¶ 123.[3]  EEO/DP responded to his email acknowledging that he planned to pursue

---

[3]     OOC, now known as the Office of Congressional Workplace Rights, was created by the CAA and is responsible for administering the statute.  2 U.S.C. § 1381.  Beginning March 23, 2018, LOC employees were allowed to file discrimination complaints with either the OOC or LOC's EEO/DP.  Def.'s SMF ¶ 130; Pl.'s SMF ¶ 74; *see also* H.R. 1625, 115th Cong. (2018), section 153 (Pub. L. 115-141).

his claim via the OOC and informing him that, as such, the EEO/DP complaint would be closed. Def.'s SMF ¶ 124.[4]

### 3.   *Plaintiff's June 2018 OOC Complaint*

On June 1, 2018, plaintiff filed a Formal Request for Counseling at OOC.  *Id.* ¶ 131; Pl.'s SMF ¶ 78.  Plaintiff again alleged discrimination based on race, sex, disability, and age, as well as retaliation, and cited in support of these claims various comments from and interactions with Cappello and Blaschke, including comments Blaschke made during the March 14 meeting, misinformation she provided about him at the Threat Assessment Group meeting, and the Notice of Proposed Adverse Action.  Pl.'s Ex. 43 (June 1, 2018 Formal Request for Counseling), ECF No. 21-4; Def.'s SMF ¶ 131.  On July 9, 2018, plaintiff requested OOC mediation for his claim. Def.'s SMF ¶ 132; Pl.'s SMF ¶ 81.  A month later, OOC informed plaintiff that the mediation period had ended, at which point he could file a formal complaint with the OOC or file a civil lawsuit.  Def.'s SMF ¶ 133; Pl.'s SMF ¶ 82.  He was also notified that if he wished to file a lawsuit in federal court, he needed to do so not sooner than 30 days and not later than 90 days after the end of the mediation period.  Def.'s SMF ¶ 133.

### 4.   *Plaintiff's October 2018 OOC Complaint*

On October 9, 2018, plaintiff filed a formal complaint with OOC, alleging "Harassment (Hostile Work Environment), Constructive Discharge, Disability Discrimination (Failure to Accommodate, Failure to Engage in Interactive Process, Disparate Treatment), [and] Retaliation."  Pl.'s SMF ¶ 84.  Neither party has submitted any evidence relating to the outcome of this administrative complaint or whether this complaint remains pending.  *See* Def.'s Resp. SMF at 39.

---

[4]      Plaintiff acknowledged in his deposition that he understood from the email exchange that his complaint would be closed.  *See* Pl.'s Dep. at 61:8–65:11, ECF No. 19-108.

### 5.    *The Instant Lawsuit*

Plaintiff filed the instant lawsuit on November 6, 2018, the ninetieth day following the mediation period for his June 2018 OOC complaint, bringing claims under the Rehabilitation Act, the ADEA, the Fifth Amendment to the Constitution, and LOC's internal regulations.  *See* Compl.  Six of the counts claiming violations of the Rehabilitation Act allege that: (1) LOC failed to provide reasonable accommodations for plaintiff's disability (Count One, *id.* ¶¶ 200–17); (2) LOC subjected him to an unlawful medical examination (Count Two, *id.* ¶¶ 218–25); (3) by changing his schedule, issuing him the reprimand and policy reminder, suspending him, and requiring him to undergo a medical examination as a condition of return to work, LOC discriminated against plaintiff on the basis of his disability (Count Three, *id.* ¶¶ 226–33); (4) those same actions were undertaken in retaliation for the complaints that plaintiff filed with EEO/DP and OOC (Count Four, *id.* ¶¶ 234–43); (5) LOC subjected plaintiff to a hostile work environment (Count Five, *id.* ¶¶ 244–59); and (6) the working conditions to which LOC subjected plaintiff were so intolerable, they amounted to constructive discharge (Count Six, *id.* ¶¶ 260–66).  The seventh count alleges that, by denying his request for accommodations, placing him on administrative leave, giving him negative performance reviews, and proposing to suspend him, LOC discriminated against plaintiff on the basis of age, in violation of the ADEA (Count Seven, *id.* ¶¶ 267–72).  Count Eight alleges that the discrimination plaintiff suffered on the basis of disability and age violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution (Count Eight, *id.* ¶¶ 273–78).  Finally, the ninth count alleges that the harassment and retaliation plaintiff suffered violated LOC's Anti-Harassment and Retaliation Policy (Count Nine, ¶¶ 279–84).  The Complaint seeks back pay, compensatory damages, punitive damages, pre-judgment interest, and attorney's fees and costs.  *See id.* at 30.

17

LOC seeks summary judgment on all counts in the Complaint, *see* Def.'s Mot. at 1–2, and plaintiff has cross-moved for partial summary judgment as to Count Two and the findings, relevant to Counts One (failure to provide reasonable accommodation for plaintiff's disability), Three (disability discrimination), and Five (hostile work environment due to disability), that plaintiff "was disabled due to his stroke, and that Defendant was aware of this disability," Pl.'s Mot. at 1.  These motions are now ripe for resolution.[5]

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a).  Summary judgment may be granted on a "claim or defense . . . or [a] part of [a] claim or defense."  Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment ("[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense.").

In determining whether a genuine dispute as to any material fact exists, the court must "view[] the evidence in the light most favorable to the non-movant."  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (quoting *Wheeler v. Georgetown*

---

[5]    On June 16, 2020, plaintiff moved for leave to amend his complaint "to replace his cause of action under the Rehabilitation Act" with "the correct underlying statute," namely, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, since LOC was not subject to the Rehabilitation Act at the time he filed his lawsuit. Pl.'s Mot. Leave Amend at 1, ECF No. 22.  Plaintiff is correct in his analysis of the unavailability of the Rehabilitation Act, and LOC does not object to plaintiff's motion to amend his complaint in this way. Def.'s Resp. Pl.'s Mot. Leave Amend at 2, ECF No. 24. Therefore, this motion is granted. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *see also Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (reversing as abuse of discretion district court's denial of plaintiff's motion to amend to substitute the Rehabilitation Act for the ADA because "claims and defenses under the two statutes are virtually identical" and employer was not prejudiced by amendment).

*Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)). Where, as here, cross-motions for summary

judgment are considered, "both parties" must be accorded "the solicitude owed non-movants,"

assessing the evidence in the light most favorable to each. *Id.* In conducting this analysis, the

record must be "taken as a whole." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,

826 F.3d 492, 496 (D.C. Cir. 2016). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks

omitted) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage[,]

the judge's function is not himself to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial.").

## III.    DISCUSSION

LOC seeks summary judgment in its favor on all nine of plaintiff's claims and, for his

part, plaintiff argues, first, that he is entitled to judgment that he had a disability and that LOC

had notice of his disability and, second, that he was subjected to an unlawful medical

examination, but otherwise asserts that genuine issues of material fact preclude summary

judgment in LOC's favor. *See* Pl.'s Mot. at 1. Plaintiff's claims are analyzed below, beginning

with his six ADA claims and then his ADEA claim, but none survive scrutiny.

### A.    ADA Claims

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a

qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA proscribes, in

addition to intentional discrimination on the basis of disability, failing to make reasonable

accommodations for the "known physical or mental limitations" of a disabled employee, *id.*

§ 12112(b)(5)(a); retaliating for statutorily protected activity, which includes filing a discrimination complaint with the employer, *id*. at § 12203(a); creating a hostile work environment, *see Hill v. Assocs. for Renewal in Education, Inc.*, 897 F.3d 232, 236 (D.C. Cir. 2018) (assuming that that the ADA allows recovery for a hostile work environment); and requiring a medical examination of an employee in order to determine the "nature or severity" of an employee's disability, 42 U.S.C. § 12112(d)(4)(A).

LOC contends that plaintiff's ADA claims, set out in the first six counts of his Amended Complaint, are barred because he failed to exhaust his administrative remedies. Def.'s Mem. at 9–13. Further, even if not barred, LOC contends these claims must fail because plaintiff has not suffered an adverse action within the meaning of the ADA, and, even if he had, LOC had a legitimate, nondiscriminatory, and nonretaliatory reason for any adverse action. *Id.* at 25–33. With respect to the hostile work environment claims, LOC contends that the alleged harassment to which plaintiff was subjected was not so severe or pervasive to alter the conditions of his employment; and, because plaintiff was not subjected to a hostile work environment, LOC argues, he also was not constructively discharged. *Id.* at 33–35, 37–38. As to the unlawful medical examination claim, LOC argues that the ADA's regulation of employer-mandated medical examinations of employees does not apply in this instance and that, even if it did, the exam was justified by business necessity. *Id.* at 36. Plaintiff counters that disputes of material fact exist as to all six claims, such that LOC is not entitled to judgment as a matter of law. Pl.'s Mot. at 1. He cross-moves for partial summary judgment findings that he was disabled and that LOC had notice of his disability. *Id.*

The Court agrees that LOC is entitled to summary judgment on plaintiff's six ADA claims for failure to accommodate, discrimination, retaliation, unlawful medical examination,

hostile work environment, and constructive discharge claims, leaving plaintiff's request for findings that, as a matter of law, he has a disability and LOC had notice of such disability, at best, moot, and, in any event, materially disputed.

### 1. *Administrative Exhaustion of Disability Claims*

When originally enacted, the Congressional Accountability Act, which broadly applies multiple anti-discrimination statutes to Congressional employees, specifically declined to apply the protections of those laws to LOC employees, leaving LOC employees subject to coverage only when so designated by the individual statutes. *See* 2 U.S.C. § 1301(3) (1995); *see also Baker v. Library of Cong.*, 260 F. Supp. 2d 59, 64 (D.D.C. 2003) (noting that the CAA in its then-current form "does not extend to [LOC] employees"). In March 2018, the CAA was amended to include LOC employees within its coverage. *See* Pub. L. 115-141, Div. I, Title I, § 153(a)(1)(A), Mar. 23, 2018, 132 Stat. 785. As the parties agree, before March 23, 2018, the ADA explicitly applied to LOC employees. *See* 42 U.S.C. § 12209; *see also* Def.'s Mem. at 6; Pl.'s Opp'n at 2. Thus, plaintiff's various administrative complaints stemming from his alleged disability are subject to two separate exhaustion regimes. Those filed before March 23, 2018 are subject to exhaustion under the ADA, whereas those filed after March 23, 2018 must comply with the exhaustion requirements of the CAA. Distinct differences exist under these statutory regimes for administrative exhaustion.

The ADA requires that "a plaintiff must exhaust her administrative remedies" before filing a federal lawsuit. *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 (D.C. Cir. 2019) (citing *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)). Exhaustion of administrative remedies "means 'fil[ing] an administrative charge with the EEOC and allow[ing] the agency time to act on the charge' before commencing litigation." *Id.* (alterations in original) (quoting *Park*, 71 F.3d at 907). "Generally, a plaintiff may only bring claims in district court that

were actually part of the administrative charge." *Id.* "This connection is necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'" *Id.* (quoting *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010)).

By contrast to the ADA, the version of the CAA applicable after March 23, 2018 and to plaintiff's administrative claims filed after that date, extends the protections of twelve federal anti-discrimination statutes, including the ADA and the ADEA, to employees of the legislative branch, including LOC. *See* 2 U.S.C. §§ 1301(a)(3)(J), 1302(a)(1)(3), (a)(1)(4).  This statute establishes "a three-step process that requires counseling and mediation before an employee may file a complaint seeking administrative or judicial relief." *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 701 (D.C. Cir. 2009).  First, before "commenc[ing] a proceeding, a covered employee . . . shall request counseling" by OOC.  2 U.S.C. § 1402(a) (1995).  The counseling request must be made "not later than 180 days after the date of the alleged violation," and the counseling period lasts for 30 days.  *Id.* § 1402(a), (b).  Second, "[n]ot later than 15 days after receipt by the employee of notice of the end of the counseling period . . . , the covered employee who alleged a violation of a law shall file a request for mediation" with the OOC, *id.* § 1403(a), which "involve[s] meetings with the parties separately or jointly for the purpose of resolving the dispute between the covered employee and the employing office," *id.* § 1403(b)(2). The mediation period also lasts for 30 days.  *Id.* § 1403(c).  Third, between 30 and 90 days after a covered employee receives notice that the mediation period has ended, the employee may file either an administrative complaint with OOC or "a civil action . . . in the United States district court for the district in which the employee is employed or for the District of Columbia."  *Id.* § 1404(b).

When an employee elects to file a lawsuit instead of an administrative complaint, the CAA provides that "[t]he district courts of the United States shall have jurisdiction over any civil action commenced . . . by a covered employee who has completed counseling . . . and mediation." *Id.* § 1408(a). The statute further specifies that "[a] civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation, *id.*, and likewise states that "[e]xcept as expressly authorized by sections [1407, 1408, and 1409], the compliance or noncompliance with the provisions of this Act and any action taken pursuant to this Act shall not be subject to judicial review." *Id.* § 1410. Thus, "counseling and mediation [are] jurisdictional requirements." *Blackmon-Malloy*, 575 F.3d at 705.[6]

Set against these two statutory regimes of the ADA and CAA, plaintiff's pursuit of administrative review of his complaints is examined next.

          *a)*      *Plaintiff's September 27, 2017 Administrative Complaint*

LOC claims that plaintiff has not exhausted his administrative remedies from his September 27, 2017 EEO/DP complaint because he failed to appeal LOC's adverse decision that this complaint was not timely. Def.'s Mem. at 10. Plaintiff responds that, pursuant to LOC regulations, the appeal was discretionary, Pl.'s Opp'n at 5, and that the ADA requires only that

---

[6]     Amendments to the CAA on December 21, 2018, after the plaintiff was terminated and had filed this suit, altered the pre-suit administrative processes and revised 2 U.S.C. § 1408, which grants jurisdiction to federal courts. Correctly, neither party disputes that the pre-amendment version of the CAA applies here. When, as here, "a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994). Congress commanded that the new CAA amendments should not apply to proceedings pending on the date the amendments became effective, which effective date was 180-days after enactment. *See* Pub. L. No. 115-397 § 401(a), 132 Stat. 5297, 5327 (2018); *id*. § 401(b) ("[n]othing in this Act or the amendments made by this Act may be construed to affect any proceeding . . . to a claim under . . . the Congressional Accountability Act . . . which is pending as of the date after that 180-day period."). As of June 20, 2019, the date after the expiration of the 180-day period, this suit, filed in November 2018, was pending. As a result, the amendments are inapplicable to plaintiff's claims. *See Landgraf*, 511 U.S. at 280 (holding that where a statute contains an "express command" about the temporal reach of the provisions, that command governs).

an employee must file a complaint, not that he must also appeal an adverse disposition of his

complaint, *id*.  Yet, just like a Title VII plaintiff, an ADA plaintiff must timely file applicable

complaints and appeals in order to bring a claim in federal court.  *See Brown v. Gen. Servs.*

*Admin.*, 425 U.S. 820, 832 (1976); *see also Bowden v. United States*, 106 F.3d 433, 437 (D.C.

Cir. 1997)).  Thus, plaintiff's failure to file a timely appeal of LOC's denial of his September

2017 EEO/DP complaint means that he did not exhaust his administrative remedies as to that

complaint.

b)     *Plaintiff's February 12, 2018 Administrative Complaint*

LOC contends that plaintiff did not exhaust his administrative remedies for his February

12, 2018 EEO/DP complaint because he opted to pursue the complaint through OOC, rather than

through LOC, and therefore consented to LOC's closure of this complaint.  Def.'s Mem. at 11.

Plaintiff protests that his abandonment of this claim was not knowing.  Pl.'s Reply Supp. Cross-

Mot. Partial Summ. J. ("Pl.'s Reply") at 10, ECF No. 27.  Yet, he was specifically advised that

because he was pursuing an OOC complaint, EEO/DP would "close out [plaintiff's] Library of

Congress EEO complaint as of Friday, April 27," Def.'s Ex. 94 (Apr. 29, 2018 Email from Vicki

Magnus to plaintiff), ECF No. 19-96, and he testified that he understood from that email that the

complaint would be closed, Pl.'s Dep. at 65:5–11.

Plaintiff further protests that even his February 2018 EEO complaint is deemed

abandoned, the governing statute requires only that an employee timely file a complaint in order

to file a subsequent lawsuit in federal court.  Pl.'s Reply at 10.  Not so. The plain text of the

statute permits a plaintiff to file a lawsuit in federal court only upon "receipt of notice of final

action taken by" LOC, 42 U.S.C. § 2000e-16(c), and plaintiff received no such notice.

Accordingly, because his February 2018 complaint was abandoned and, consequently, LOC did

24

not act on it one way or another, this complaint was not administratively exhausted. *See Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (explaining that exhaustion requires a plaintiff to "fil[e] an EEOC charge and *giv[e] [the employing] agency a chance to act on it*." (emphasis added)).

      *c)*    *Plaintiff's June 1 and October 9, 2018 Administrative Complaints*

LOC acknowledges that plaintiff exhausted his administrative remedies for his June 1, 2018 Formal Request for Counseling with OOC (which followed his February 12, 2018 EEO complaint), but points out that this OOC complaint contained no allegations about unlawful medical examination, hostile work environment, failure to accommodate, or constructive discharge. Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Partial Summ. J. ("Def.'s Reply") at 13–14, ECF No. 26.[7] Plaintiff does not contest that the June 2018 OOC complaint, standing alone, fails to exhaust many of his claims.

Instead, plaintiff relies on his subsequent October 9, 2018 request for counseling with OOC to cure any exhaustion defect in the June 2018 complaint. *See.* Pl.'s Reply at 11. Indeed, the October 2018 OOC complaint explicitly alleged "Harassment (Hostile Work Environment), Constructive Discharge, Disability Discrimination (Failure to Accommodate, Failure to Engage in Interactive Process, Disparate Treatment), [and] Retaliation," and the facts underlying those claims. *See* Pl.'s SMF ¶ 84. This complaint, however, has not been exhausted, because although plaintiff filed a request for counseling, he did not subsequently submit a request for mediation as required by the CAA, *see* 2 U.S.C. §§ 1403(a), 1408. Plaintiff argues in response that he was not

---

[7]    LOC briefly contends that plaintiff did not exhaust his administrative remedies as to June 2018 OOC complaint, because the notice plaintiff received on August 10, 2018 about the mediation period ending did not actually relate to this complaint. Def.'s Reply at 13 n.9; Def.'s Resp. SMF at 82, 132–33. The June 2018 complaint was given case number 18-LC-38, whereas the August notice that the mediation period had ended referred to case number 18-LC-29. This seems to be a typographical error, however, given that no complaint filed by plaintiff was ever given case number 18-LC-29, and the only complaint for which the mediation period would have ended in August was the June 2018 complaint. This argument is therefore unavailing.

"required to plead exhaustion of remedies" in his complaint.  Pl.'s Opp'n at 11 (citing *Rosier v. Holder*, 833 F. Supp. 2d 1, 6 (D.D.C. 2011)).  That objection is misplaced, however, because the CAA's exhaustion requirements are jurisdictional, *see Blackmon-Malloy*, 575 F.3d at 705–06, and at the summary judgment stage, plaintiff bears the burden of demonstrating that the Court has jurisdiction.  *See Keepseagle v. Vilsack*, 815 F.3d 28, 32 (D.C. Cir. 2016) ("Because '[f]ederal courts are courts of limited jurisdiction,' '[i]t is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction.'" (alterations in original) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994))).

Thus, only plaintiff's June 2018 OOC complaint was administratively exhausted, and so he may proceed with his ADA claims only to the extent asserted in that administrative complaint. *See Haynes*, 924 F.3d at 526.  On the counseling request form for that complaint, plaintiff checked boxes indicating that he had been discriminated against on the basis of race, sex, disability, and age, and that he had been retaliated against for requesting mediation.  Def.'s Ex. 101 (June 1, 2018 OOC Complaint), ECF No. 19-103.  In the portion of the form asking him to describe specific complained-of conduct, plaintiff listed four incidents, alleging that: (1) on March 14, 2018, Blaschke "made condescending remarks about [his] disability," *id.*; (2) the next day, March 15, Cappello called plaintiff "to put [him] on admin[istrative] leave" following the March 14 meeting, and further "began to badger [plaintiff] into saying [he] was angry," *id.*; (3) on March 16, Blaschke wrongly "reprimanded [him] for making false statements" and "provided misinformation" about an interaction she had with plaintiff, with her falsely claiming that he blocked her exit from her office, *id.*; and (4) on May 8, Cappello "presented [plaintiff] with a letter of proposed adverse action th[at] was based on mischaracterized claims," *id.*

As LOC argues and plaintiff does not contest, *see* Def.'s Reply at 13–14; Pl.'s Reply at 11, these four allegations do not mention, allude to or provide a basis for plaintiff's unlawful medical examination, hostile work environment, failure to accommodate, and constructive discharge claims.  *See Haynes*, 924 F.3d at 526 (noting that a plaintiff "may only bring claims in district court that were actually part of the administrative charge" or that, "'at a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination'" (omission in original) (quoting *Payne*, 519 F.3d at 65)).  Plaintiff's unlawful medical examination, hostile work environment, failure to accommodate, and constructive discharge claims were not "part of" the June 2018 OOC complaint, and an investigation into the events of the March 14 meeting would not reasonably have led to discovery of those claims.[8]  Accordingly, the Court "lacks subject-matter jurisdiction" over plaintiff's claims in Counts One, Two, Five, and Six, and they must be dismissed.  FED. R. CIV. P. 12(h)(3).[9]  That leaves only plaintiff's claims that he was discriminated against on the basis of disability and retaliated against for requesting mediation.

---

[8]      Arguably, an investigation into the March 14 meeting could uncover the facts underlying plaintiff's unlawful medical examination claim because LOC's permission for plaintiff to return to work from administrative leave following the meeting was contingent on a mental health professional submitting documentation that he was not a threat to himself or others.  *See supra* Part I.A.5.  Even if the medical examination were discoverable based on plaintiff's June 2018 complaint, however, plaintiff's claim, in Count Two, that the examination was unlawful would nevertheless fail.  "To state a claim for an unlawful medical inquiry, a plaintiff must allege that the employer in fact conducted an impermissible 'inquiry into [the plaintiff's] medical condition.'"  *Menoken v. Dhillon*, 975 F.3d 1, 12 (D.C. Cir. 2020) (alteration in original) (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343–44 (D.C. Cir. 2003)); *see also* 42 U.S.C. § 12112(d)(4)(A).  The ADA "makes clear," however, "that employers may conduct 'inquiries into the ability of an employee to perform job-related functions.'"  *Menoken*, 975 F.3d at 12 (quoting 42 U.S.C. § 12112(d)(4)(B).  The medical inquiry that occurred here was plainly directed at determining whether plaintiff could "perform job-related functions," *id.*, by ensuring that plaintiff was not a threat to himself or his coworkers as an essential precondition for his ability to perform any work at all.  Accordingly, even if discovered by an investigation into the allegations of plaintiff's June 2018 OOC complaint, the medical examination forming the basis of Count Two was not "unlawful" within the meaning of the ADA.
[9]      Since plaintiff's unlawful medical examination claim must be dismissed for failure to exhaust, plaintiff's motion for summary judgment on that claim, *see* Pl.'s Mot. at 1, is denied as moot.

## 2. *Intentional Discrimination and Retaliation Claims*

The ADA prohibits employers from discriminating against an employee on the basis of disability and from retaliating against employees who engage in protected activity under the statute.  *See Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1371 (D.C. Cir. 2020) (citing 42 U.S.C. § 12112(b)(5)(A)); 42 U.S.C. § 12203(a).  In analyzing retaliation and discrimination claims under the ADA, absent direct evidence of discrimination, the D.C. Circuit employs the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), developed in the Title VII context.  *See Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1099 (D.C. Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. 792) (retaliation under ADA); *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (discrimination under ADA). At the summary judgment stage, "once the employer asserts a legitimate, non-discriminatory reason [for its challenged action]," "the only remaining question is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'"  *Giles*, 794 F.3d at 6 (alteration in original) (first quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); and then quoting *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).

As explained, the allegations of plaintiff's June 2018 OOC complaint that were administratively exhausted and asserted in support of his claim of discrimination and retaliation are the events of the March 14, 2018 meeting; being put on administrative leave following that meeting; and, finally, the Letter of Proposed Adverse Action, which proposed a ten-day suspension.  LOC has proffered legitimate business purposes for each of these actions.  Recall that the March 14, 2018 meeting was prompted by concerns that plaintiff had not followed LOC procedures by obtaining his supervisor's approval before registering for a weeklong training,

compounded by discrepancies in how plaintiff signed-in for during the training session, which lasted for the entire week, from March 5 through March 9, 2018.  On each of those days of the training, the work sign-in sheets for FEDLINK staff show that plaintiff's signature was placed on the last line of the sheet, leaving large gaps in the sequential numbering of other staff, whose arrival times are in chronological order consistent with their sequential sign-in.  According to Blaschke, "it was not common or accepted practice to sign in on other locations" of the sign-in sheet, "such as the middle or the bottom of the page," Decl. of Melissa Blaschke ¶ 4, ECF No. 19-41, since "signing in sequentially in the order of arrival facilitates an accurate accountability of time worked and dissuades employees from listing earlier arrival time than the time at which the employee actually reported for work," *id*. ¶ 5.  Plaintiff "did not sign in at the bottom of the sign-in sheet during the other times that [Blaschke] supervised him."  *Id*. ¶ 8.  In other words, the manner in which plaintiff signed the sheet made it difficult to ascertain whether his sign-in time of "7 AM" was accurate or when precisely he showed up for work each day of the training week.

LOC has an appropriate interest in ensuring employee compliance with those workplace rules, and plaintiff failed to comply with these rules both by failing to obtain pre-approval to attend the training and then using an unusual and fairly suspicious manner to sign-in for each day of the training.  *See* Def.'s Mem. at 29–30.  As Blaschke explained in the reprimand, "it should not take [plaintiff] an hour to get to class, and [he] did not complete FEDLINK work in the hour before class began on Tuesday, March 6, 2018, when [he] signed in at 7:00 a.m."  Def.'s Ex. 83 (Mar. 14, 2018 Memorandum from Melissa Blaschke to plaintiff), ECF No. 19-85.  She went on to note that LOC policies required that "staff members shall avoid any action which might result in or create the appearance of impeding [LOC] efficiency or economy" and "shall so conduct themselves as to permit no reasonable basis for suspicion of unethical conduct or practices."  *Id.*

The manner in which plaintiff had signed in during the training week—when he was outside his normal work station and not subject to normal supervision—raised concern that he may have exploited this opportunity and gave rise to an appearance of dishonesty or at least inefficiency, and justified the reprimand, policy reminder, and short meeting to deliver these concerns personally.

In hand delivering the written reprimand and policy reminder, Blaschke testified that she "was following the advice of [LOC's] human resources office," and that she "also agree[d] with the approach of providing the information in a meeting and [o]n paper." Blaschke Dep. at 77:11–14. It was also reasonable of her to have Caldwell present when she delivered plaintiff the documents, given that a few weeks prior, in early February, she had a workplace interaction with plaintiff in which he spoke with what she described as a "heated" tone "bordering on yelling." Def.'s SMF ¶ 88.

Placing plaintiff on administrative leave immediately following the meeting due to his aggressive conduct, as perceived by his immediate supervisor and another witness, and later proposing a ten-day suspension, were likewise justified by legitimate, nondiscriminatory reasons. Specifically, these were reasonable and proportional responses to the information that LOC had about the events of the March 14, 2018 meeting, given LOC's concern that plaintiff presented a danger to himself or others and that, even if not, his conduct during the meeting was unprofessional and inappropriate. *See* Def.'s Mem. at 31–33.

The only evidence plaintiff cites suggesting that these legitimate reasons for LOC's actions were not its true reasons is the temporal proximity between these actions and his administrative complaints. *See* Pl.'s Opp'n at 22, 27. Specifically, the confrontational March 14, 2018 meeting, resulting in plaintiff's administrative leave and proposed suspension, occurred

barely a month after plaintiff filed his February 12, 2018 EEO complaint complaining of Blaschke's changes to his schedule.  *Id.* at 27.  "To establish a retaliation claim, [plaintiff] must show, inter alia, that there 'existed a causal link'" between the adverse action and his protected activity, *Minter v. Dist. of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) (quoting *Smith v. Dist. of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005)), and "a close temporal relationship may alone establish the required causal connection," *Singletary v. Dist. of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003).  "[W]hen an employer comes forward with a legitimate, nonretaliatory reason for an employment action, [however,], 'positive evidence beyond mere proximity' is required to 'create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation.'"  *Minter*, 809 F.3d at 71–72 (third alteration and omission in original) (quoting *Solomon v. Vilsack*, 763 F.3d 1, 16 (D.C. Cir. 2014)); *see also Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) (holding that when employer has made "a legitimate proffer," "positive evidence beyond mere [temporal] proximity is required to defeat the presumption that the proffered explanations are genuine").[10]  Thus, the temporal relationship between plaintiff's February 2018 EEO/DP complaint and the March 14 meeting, although a close one, *see Singletary*, 351 F.3d at 525 (referring to a month-long gap between plaintiff's protected action and employer's denial of his promotion as "quite close" temporal proximity), is insufficient to rebut LOC's legitimate proffered reasons for the meeting and subsequent actions, namely, the need to address plaintiff's noncompliance with LOC procedures and his perceived threatening and unprofessional behavior at the meeting.  Consequently, no reasonable jury could

---

[10]     In *Woodruff*, the D.C. Circuit affirmed the district court's grant of summary judgment for defendant on plaintiff's retaliation claim because temporal proximity to protected activity was plaintiff's only evidence that the employer's proffered reason for the adverse action was pretextual, 482 F.3d at 530–31, and remanded plaintiff's discrimination claim, which was based on a wholly different factual basis, *id.* at 527–28, unlike here, where plaintiff relies on the identical alleged adverse actions as support for both his discrimination and retaliation claims.

find that LOC discriminated or retaliated against plaintiff due to his disability rather than the specific reasons cited by LOC for the actions taken. LOC's motion for summary judgment is therefore granted on Counts Three and Four.[11]

**B.      ADEA Claim**

The ADEA makes it unlawful "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may support an ADEA claim with indirect evidence, in which case the *McDonnell Douglas* framework again applies. *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014). "At the summary judgment stage, the 'operative question' is whether 'the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the employee on the basis of age.'" *Id.* (omission in original) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam)).

---

[11]     Plaintiff has sought partial summary judgment on findings that he has a disability and LOC knew this fact. Pl.'s Mot. at 1. Although the parties agree that plaintiff suffered a stroke on April 26, 2017 and that he had a disability within the meaning of the ADA, they dispute when LOC became aware that his condition qualified as a disability. *See* Pl.'s Opp'n at 8–9; Def.'s Reply at 2. To be sure, LOC was on notice of plaintiff's disability upon receipt of requested medical documentation from plaintiff in April 2018, which resulted in LOC's determination that plaintiff was "recovering from a severe medical condition that substantially limits one or more major life activities." Def.'s Ex. 92 (Apr. 16, 2018 Memorandum from Arlene Klauber to Melissa Blaschke), ECF No. 19-94. Prior to receipt of this documentation, however, LOC lacked "medical records or other evidence detailing . . . the extent of the effects of his stroke on his cognitive abilities and motor control." Def.'s Reply at 2. Without contesting that he did not provide documentation about his disability to LOC until April 2018, plaintiff insists LOC was on notice of his disability before then due to his request for advanced sick leave in May 2017 and because his stroke was common knowledge at FEDLINK. Pl.'s Opp'n at 9. When LOC was on notice of plaintiff's disability is primarily relevant to plaintiff's failure to accommodate claim, *see Waggel*, 957 F.3d at 1371 (noting that one of the elements of a reasonable accommodation claim is that "the [employer] had notice of [plaintiff's] disability" (first alteration in original) (quoting *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014))), but this claim is barred for failure to exhaust. *See supra* Part III.A.1(a)–(b). Further, even assuming that plaintiff was disabled within the meaning of the ADA, no reasonable jury could conclude that LOC discriminated against plaintiff on the basis of his disability. *See supra* Part III.A.2. Thus, whether plaintiff had a disability, and when LOC had notice of this condition as a legal matter, are not material facts necessary for resolution of plaintiff's other claims. Accordingly, plaintiff's motion for partial summary judgment is denied as moot.

The CAA extends coverage of the ADEA to LOC employees, *see* 2 U.S.C. § 1302(a)(4), and thus the CAA's exhaustion requirements apply to plaintiff's ADEA claim in Count Seven. Plaintiff may advance his ADEA claim only to the extent it is supported by his June 2018 OOC complaint, the only properly exhausted administrative complaint.  As already explained, LOC has asserted a legitimate and nondiscriminatory justification for the conduct plaintiff complained of in that complaint.  The issue at the summary judgment stage is therefore whether plaintiff has brought forth evidence from which a reasonable jury could infer that LOC's stated reasons for the complained-of conduct, namely the need to enforce its personnel policies and ensure the safety of the workplace, were not its true reasons and that age-based animus was its actual reason.  *See Wilson*, 753 F.3d at 247.

Plaintiff has not sustained his burden on his ADEA claim.  Plaintiff cites the fact that he was asked several times by various LOC supervisors whether he planned to retire as suggesting that LOC's stated reasons for the complained-of conduct are pretextual.  Pl.'s Opp'n at 32. Although comments about an employee's age can, in some circumstances, create a genuine issue of material fact as to the employer's true reason for an adverse employment action, *see, e.g.*, *Breen v. Chao*, 253 F. Supp. 3d 244, 259–60 (D.D.C. 2017) (holding that an employer's "widespread comments related to age—in particular, uses of the terms 'aging workforce' and 'retirement eligible'—create a genuine issue of material fact concerning pretext"), the comments plaintiff cites here do not.  Rather, LOC's inquiries about plaintiff's retirement plans were reasonable, given its possible confusion about those plans following plaintiff's own request for information about disability retirement.  Def.'s SMF ¶ 31.  Those inquiries occurred in September 2017, roughly three months after plaintiff's return to work at the time he was requesting FMLA and advanced medical leave and information about disability retirement, long

before the March 14, 2018 meeting.  *See supra* Part I.B.1; *see also* Def.'s SMF ¶ 66; Pl.'s SMF

¶ 41.  In light of the persuasive legitimate reason that LOC has proffered and the fact that

plaintiff's evidence of pretext does not in fact suggest age-based animus, no reasonable jury

could conclude that LOC discriminated against plaintiff on the basis of age.  Defendant's motion

for summary judgment on this claim is therefore granted.[12]

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's motion to amend his complaint to replace his

Rehabilitation Act claims with ADA claims is granted, with no objection from LOC.  Since he

failed to exhaust all but one of his administrative complaints, this Court may exercise jurisdiction

to consider only the allegations set out in plaintiff's June 2018 OOC administrative complaint,

with the result that his claims of unlawful medical examination, hostile work environment,

failure to accommodate, and constructive discharge claims, in Counts One, Two, Five, and Six,

must be dismissed for failure to exhaust.  Further, no reasonable jury could conclude that LOC

discriminated against plaintiff on the basis of disability or age, or that LOC retaliated against

plaintiff due to his filing of administrative complaints, in light of the undisputed legitimate

business reasons for LOC's challenged actions, entitling LOC to summary judgment on Counts

Three, Four, and Seven.  Plaintiff's claims under the Fifth Amendment and for violation of

---

[12]     Plaintiff also claims, in Counts Eight and Nine, that the discrimination, harassment, and retaliation he alleges amount to violations of the Fifth Amendment and LOC's internal regulations prohibiting harassment and retaliation.  *See* Am. Compl. ¶¶ 273–78, 279–84, ECF No. 22-1.  These claims, neither of which plaintiff defends in his opposition to LOC's motion for summary judgment or reply, are unavailing.  First, "federal employees may not bring suit under the Constitution for employment discrimination that is actionable" statutorily, *Ethnic Emps. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985), entitling LOC to summary judgment on Count Eight. Second, LOC's internal regulations create no private right of action to sue for enforcement of the regulation, *see* 42 U.S.C. § 12209(5) (granting LOC authority to promulgate antidiscrimination regulations but not creating a private right of action to sue for its violation), and Congress has not waived sovereign immunity as to lawsuits alleging violation of LOC regulations, s*ee Terveer v. Billington*, 34 F. Supp. 3d 100, 122–23 (D.D.C. 2014) (dismissing employee's claim against LOC for violation of LOC regulations because he had no cause of action and had not shown that LOC had waived sovereign immunity as to such claims).  LOC is therefore entitled to summary judgment on plaintiff's claim based on a violation of LOC's internal regulations in Count Nine.

LOC's internal regulations are without merit, entitling LOC to summary judgment on Counts Eight and Nine.  Plaintiff's motion for partial summary judgment as to his disability, LOC's notice of the same, and his unlawful medical examination claim, Count Two, is denied as moot.

Accordingly, LOC's Motion for Summary Judgment is granted, and plaintiff's Cross-Motion for Partial Summary Judgment is denied. An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: November 2, 2020.

_____
BERYL A. HOWELL
Chief Judge